Eloise **PERKINS** and Dennis Perkins, Appellants,

v.

**NORTHEASTERN LOG HOMES;** Roberts Consolidated Industries, Inc., and DAP, Inc., Appellees.

No. 90–SC–738–CL.

Supreme Court of Kentucky.

May 9, 1991.

Gary M. Weiss, Weiss & Roseberry, Louisville, Richard S. McMillin, Timothy J. Cuddigan, Omaha, Neb., for appellants.

Charles S. Cassis, John David Dyche, Louisville, for Northeastern Log Homes.

Robert M. Brooks, Boehl, Stopher, Graves & Deindoerfer, Louisville, Robert M. Slovek, Sodoro, Daly & Sodoro, Omaha, Neb., for Roberts Consolidated & DAP, Inc.

LEIBSON, Justice.

The U.S. District Court for the Western District of Kentucky has certified to the Kentucky Supreme Court the following *Questions of Law* at issue in the above-styled case:

"(1) whether KRS 413.135 violates Kentucky Constitution §§ 14, 54, 59, and/or 241; and

(2) whether KRS 413.135 applies to latent disease cases and, if so, whether the statute of limitations commences from the date the plaintiff knows or should have discovered the injury or disease."

For reasons that we will address, our answer to the first question is that the statute in question violates the Kentucky Constitution, and our answer to the second question is that KRS 413.135 does not nullify the "discovery rule" which applies "to tort actions for injury from latent disease caused by exposure to a harmful substance." *Louisville Trust Co. v. Johns-Manville Products*, Ky., 580 S.W.2d 497, 501 (1979).

The Certification from the U.S. District Court states the following facts:

"Plaintiffs Eloise and Dennis Perkins (the Perkins) filed their product liability action against defendants Northeastern Log Homes, Inc. (Northeastern), Roberts Consolidated Industries, Inc. (Roberts), and DAP, Inc. (DAP), on June 16, 1989. Defendants removed the case [from Jefferson Circuit Court to federal court] on July 10, 1989.

Plaintiffs purchased a log home kit from Northeastern on June 24, 1977. Northeastern manufactured the construction components of the log home. Roberts and DAP designed and manufactured "Woodlife," a product used to preserve the log home. The Perkins finished constructing their home in November 1978 and they lived in it until June 1989.

Eloise Perkins discovered she had non-Hodgkin's lymphoma around March 31,

1986. She alleges that her illness developed from continued exposure to Pentachlorophenol, which "Woodlife" contained."

Appellants' Complaint is an exhibit to the Brief filed by Roberts and DAP (hereinafter "Roberts"). It identifies Northeastern's product as a "Log Home Kit" which the appellants purchased and then assembled and constructed into a log home which they located in Floyds Knob, Indiana. It alleges: "[b]eginning with the construction period in approximately August, 1977 through June 9, 1989, Plaintiffs were exposed in their log home, built from the Northeastern kit, to toxic concentrations of the chemical, technical-grade Pentachlorophenol, which was an active ingredient in the 'Woodlife' ...."; the "log home is unfit for human habitation ... as a result of said toxic contamination"; and a cause of action for strict liability "by reason of defects in the product ... rendering the product unreasonably dangerous," and, separately, for "negligent failure to design, negligent failure to properly manufacture and assemble the product ..., failure to adequately warn and instruct concerning the use and failure to adequately test and inspect the product."

Appellants have supplemented their Brief with affidavits from a medical expert and their attorney, stating in substance that Eloise Perkins suffers from a non-Hodgkins' lymphoma, a cancer caused by exposure to Pentachlorophenol, with the "appearance of symptoms ... in March of 1986," that her first notice of any possible connection between her cancer and the log home kit in question occurred in February 1989, the first medical confirmation occurred in March 1989, and the suit was filed on June 16, 1989. We accept these claims along with the facts stated in the Certification as a factual premise in addressing the underlying legal issues.

## I. DOES KRS 413.135 VIOLATE KENTUCKY CONSTITUTION §§ 14, 54, 59 AND/OR 241

KRS 413.135 is the latest edition of a statute first enacted in 1964 and 1966,[1] to protect builders and others engaged in the "design, planning, supervision, inspection, or construction of any improvement to real property" from suit for damages, personal injury or wrongful death, five years after the substantial completion of such improvement. The statute was referred to as the builders, architects and engineers "no action" statute and is mislabeled "an act relating to limitations of actions," because its purpose is not to signal the end of the period for filing a cause of action that has already accrued, but to cut off the period of exposure to liability for a construction defect where no cause of action has yet accrued because the damage, injury or death caused by the deficiency first occurred more than five years after substantial completion of construction. It is not a statute of limitations but a statute of repose because it extinguishes the claim before it exists. For that reason, the 1964/66 edition of the statute of repose for persons in the construction industry has been challenged as unconstitutional in previous cases before this Court. Its legal history can be summarized as follows:

1) In *Saylor v. Hall*, Ky., 497 S.W.2d 218 (1973), the statute was held unconstitutional as a violation of our Kentucky Constitution, §§ 14, 54 and 241.

Kentucky Constitution § 14 is part of the Bill of Rights in our first constitution of 1792. It is the "open courts" provision and states as follows:

"All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

Kentucky Constitution §§ 54 and 241 were added as new provisions in our Fourth (and last) Constitution of 1891. These were enacted along with many other provisions to limit the power of the General Assembly, which was then widely perceived as abusing its power with the grant of privileges and immunities to railroads and

---

1. Two statutes were later combined into one.

other powerful corporate interests. *See* Debates, Constitutional Convention of 1890, 4 Vol.

"Most of the delegates to the Constitutional Convention felt that the real root of Kentucky's governmental problems was the almost unlimited power of the General Assembly. One of them even said that '... the principal, if not the sole purpose of the constitution which we are here to frame, is to restrain its [the Legislature's] will and restrict its authority....'

They distrusted the General Assembly, so they wrote many details of law into the Constitution." p. 161, Research Report No. 137, Legislative Research Commission, Jan. 1987.

Kentucky Constitution § 54 prohibits the General Assembly from enacting any "restriction on recovery for injury or death." It provides:

"The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

Section 241 was enacted to protect the right of "recovery for wrongful death" against legislative interference. It provides in pertinent part:

"Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same."

The essence of *Saylor v. Hall* is found in the following quote:

" 'It is not within the power of the legislature, under the guise of a limitation provision, to cut off an existing remedy entirely, since this would amount to a denial of justice, and, manifestly, an existing right of action cannot be taken away by legislation which shortens the period of limitation to a time that is already run.' [Citation omitted]. Surely then, the application of purported limitation statutes in such manner as to destroy a cause of action before it legally exists cannot be permissible if it accomplishes destruction of a constitutionally protected right of action." *Id.* at 225.

2) *Carney v. Moody,* Ky., 646 S.W.2d 40, 41 (1983), did not overrule *Saylor v. Hall,* but it reached the opposite result. The Court stated the "problem with the *Saylor* opinion" was it "did not discuss or decide the question of whether the facts would have given rise to a legal cause of action not only when the statutes of limitation were enacted in 1964 and 1966, but also when the Constitution was adopted in 1891." Of course, this was not so because *Saylor v. Hall* specifically held the constitutional defect in the statute was it:

"[D]estroys, pro tanto, a common-law right of action for negligence that proximately causes personal injury or death, which existed at the time the *statutes were enacted* [Emphasis added]. The statutory expressions as they relate to actions based on negligence perform an abortion on the right of action, not in the first trimester, but before conception." 497 S.W.2d at 224.

3) *In re Beverly Hills Fire Litigation,* Ky., 672 S.W.2d 922 (1984), we again addressed the constitutionality of KRS 413.-135, now restored by *Carney v. Moody,* but it did not directly answer the question. The subject matter of the controversy was allegedly defective aluminum circuit wiring installed at the Beverly Hills Supper Club which burned to the ground. We held this material was beyond the reach of the statute's application, stating:

"(1) Properly construed this statute has no application here to what is essentially a products liability case.

(2) Otherwise construed, this statute would be 'special' legislation in violation of the Kentucky Constitution, § 59." 672 S.W.2d at 923.

4) *Tabler v. Wallace,* Ky., 704 S.W.2d 179 (1986), again addressed the statute in terms of the Kentucky Constitution, § 59. This time we declared the 1964/66 statute was unconstitutional as lacking "a rational justification for creating a special class and conferring special privileges and immunity on that class at the time the statute in question was enacted." *Id.* at 187.

One aspect of the Opinion discussed the irrationality of creating immunity for the builder or designer in circumstances where the materialman or supplier would still be liable. Before the ink was dry on *Tabler v. Wallace*, the General Assembly reenacted KRS 413.135 in present form which extends the subject matter of the statute to "construction components," and which extends the statutory protection to "any person," so long as the gravamen on the action is a deficiency in real estate. The new statute also changed the period before which the right of action would be cut off, extending it from five to seven years.

These changes failed to address the essence of the Opinion in *Tabler v. Wallace*. The fundamental problem in *Tabler v. Wallace*, was "constitutionally impermissible arbitrariness," and the revisions only dealt with examples of the problem. 704 S.W.2d at 187. Our opinion states:

> "It suffices that the argument highlights the arbitrariness of providing an immunity to those engaged in design and construction of a real estate improvement which does not extend to others similarly situated. It was this type of arbitrariness that Kentucky Constitution § 59 in general, and subsection 5 in particular, was designed to prevent." *Id.* at 188.

Because the thrust of the revisions to KRS 413.135 enacted by the 1986 General Assembly was to circumvent the constitutional defects underpinning *Tabler v. Wallace*, we turn first to the validity of this new legislation under the Kentucky Constitution, § 59. The pertinent parts of the 1986 revisions are in Subsection One. They can best be understood as they appear in the official version of the Kentucky Acts, 1986, with the words that were added *italicized,* and the words that were deleted bracketed and interlineated:

> "(1) No action to recover damages, whether based upon contract or sounding in tort, resulting from or arising out of any deficiency in the *construction components,* design, planning, supervision, inspection or construction of any improvement to real property, or for any injury to property, either real or personal, arising out of such deficiency, or for injury to the person or for wrongful death arising out of any such deficiency, shall be brought against any person [performing or furnishing the design, planning, supervision, inspection or construction of any such improvement] after the expiration of *seven (7)* [five (5)] years following the substantial completion of such improvement." HB 543, Ch. 479 Ky. Acts, 1986.

A prefatory clause which is not part of the statute was added before the enactment clause, no doubt because *Tabler v. Wallace* stated the statute lacked "a reasonable basis for this legislation sufficient to justify creating a separate classification for certain persons engaged in the construction of improvements to real property." 704 S.W.2d at 185. This preface states:

> "WHEREAS, without protection by a statute of limitations there will be a chilling effect on the contributions of builders, architects, engineers, suppliers, manufacturers and materialmen to the state's economy;"

Thus, KRS 413.135 now protects "suppliers, manufacturers and materialmen" as well as builders, architects and engineers, but, of course, only to the extent that their products are used as "construction components" in an "improvement to real property." These revisions to avoid the constitutional shortcomings addressed in *Tabler v. Wallace* resurrect other special legislation problems confronted in *In re Beverly Hills, supra.* As we discussed earlier, in the *Beverly Hills* case we held the statute should not be interpreted to extend immunity to products manufacturers and suppliers *because to so interpret it would make it constitutionally defective under § 59.* We stated:

> "Certainly a law that protects product manufacturers if or when their product is used in the design or construction of a permanent improvement to real estate, but not otherwise, would discriminate in favor of such a manufacturer in an arbitrary manner and create a classification that has no reasonable justification. No one yet has suggested any reason why a

special classification should be created for products because they are used in construction of a building, as opposed to a motor vehicle or some other structure that is personalty. *Many products, the present one included, are subject to foreseeable uses both in real estate improvements and otherwise.* The statutory interpretation offered by the defendants would not only distinguish their product from other products in an arbitrary manner, it would result in the same product having *immunity in some circumstances and not in others with no reasonable justification.*" [Emphasis added]. *In re Beverly Hills Fire Litigation,* 672 S.W.2d at 926.

The *Beverly Hills* case should have been a clear warning that the statute could not be amended to avoid the special legislation problem by extending it to "construction components." The 1986 revisions were in disregard of that warning.

The present case serves to illustrate the arbitrariness addressed by the above quote. The construction component involved here is a preservative called "Woodlife," alleged to contain a toxic substance which can be used in all kinds of wood products. Its use as a construction component in a real estate improvement rather than a component in personalty is a purely fortuitous circumstance. As stated above in the quotation from *In re Beverly Hills,* to provide a statute of repose for products "in some circumstances and not in others with no reasonable justification" for making a distinction, violates § 59. The same rule is thus stated in *Board of Education of Jefferson County v. Board of Education of Louisville,* Ky., 472 S.W.2d 496, 498 (1971):

"A special law is legislation which arbitrarily or *beyond reasonable justification* discriminates against some persons or objects and favors others."

Next, we consider the impact of §§ 14, 54 and 241 of our Constitution, quoted earlier in this Opinion. In *Tabler v. Wallace,* having decided KRS 413.135 was unconstitutional as special legislation, we elected not to "write Chapter Three to *Saylor v. Hall* and *Carney v. Moody.*" *Id.* at 187. This was misconstrued as an opening to revise the statute to meet certain language in the *Tabler v. Wallace* opinion. This time we will address whether the statute is unconstitutional under §§ 14, 54 and 241 in order to fully answer the question certified and to avoid, if possible, yet another round of statutory revision and opinion.

The holding in *Saylor v. Hall,* was:

"The legislature's *power to enact statutes of limitation* governing the time in which a cause of action must be asserted by suit *is,* of course, *unquestioned.* In this state, however, it is *equally well settled* that the legislature *may not abolish an existing common-law right of action for personal injuries or wrongful death caused by negligence....* [T]he application of these statutory expressions to the claims here asserted *destroys,* pro tanto, *a common-law right of action* for negligence that proximately causes personal injury or death, *which existed at the times the statutes were enacted.* The statutory expressions as they relate to actions based on negligence perform an abortion on the right of action, not in the first trimester, but before conception.

The right of action for negligence proximately causing injury or death, which is constitutionally protected in this state, requires more than mere conduct before recovery can be attempted. Recovery is not possible until a cause of action exists. *A cause of action does not exist until the conduct causes injury that produces loss or damage....*

'[M]anifestly, *an existing right of action cannot be taken away by legislation which shortens the period of limitation to a time that has already run.'* [Citation omitted.] Surely then, the application of purported limitation statutes in such manner as to destroy a cause of action before it legally exists cannot be permissible if it accomplishes destruction of a constitutionally protected right of action.

. . . .

In our judgment [this statute] cannot be applied to bar the plaintiffs' claims in

this action. Such application is constitutionally impermissible in this state because it would violate the spirit and language of Sections 14, 54, and 241 of the Constitution of Kentucky when read together." [Emphasis added]. 497 S.W.2d at 224–25.

We subscribe to the law as stated in *Saylor v. Hall.* *Carney v. Moody* reaches a different result without overruling *Saylor v. Hall,* by limiting the application of these constitutional provisions to whether "the law as it prevailed in 1891 would have afforded the injured parties a remedy against the negligent builder or builders." 646 S.W.2d at 41. We believe that in *Carney v. Moody* the controlling constitutional sections have been applied more narrowly than the constitution permits so as to cause an arbitrary result, and that the cases cited in the *Carney v. Moody* opinion to justify the decision, *Happy v. Erwin,* Ky., 330 S.W.2d 412 (1959), *Ludwig v. Johnson,* 243 Ky. 533, 49 S.W.2d 347 (1932), and *Ky. Utilities Co. v. Jackson–County Rural Electric Coop. Assoc.,* Ky., 438 S.W.2d 788 (1969), do not support its conclusions. Each of these cases involved statutes held *unconstitutional* as infringing constitutionally protected jural rights. In each it is very questionable whether the specific fact situation involved "would have given rise to a legal cause of action ... when the Constitution was adopted in 1891." *Carney v. Moody* as quoted *supra.* For example, the first definitive case on the subject is *Ludwig v. Johnson, supra,* holding the automobile "guest statute" unconstitutional in violation of §§ 14, 54 and 241 of our Constitution. The statute barred a cause of action for damages by a guest passenger in an automobile against an owner or operator for "any injuries received, death, or any loss sustained, in case of accident, unless such accident shall have resulted from an intentional act on the part of said owner or operator." 49 S.W.2d at 348. Surely there were no cases in Kentucky establishing a cause of action, as such, for a guest passenger in an automobile against the host driver in 1890 when Kentucky Constitution §§ 54 and 241 were written. Speaking to the principle of statutory con-

struction affording presumptive validity to statutes, our Court said:

"Such principle, however, has no application when the enactment of the particular statute under consideration is either expressly or by necessary implication inhibited or is subversive of the purposes and intentions of the makers of the Constitution. It then becomes the duty of the courts to pronounce the statute unconstitutional.

Prior to the enactment of the 'guest statute,' the rule was well settled in this state that the driver of an automobile owed an invited guest the duty of exercising ordinary care in its operation." *Id.* at 348–49.

The opinion reviews the three sections of the Constitution at issue, §§ 14, 54 and 241, with appropriate comments on each. It then addresses one of the arguments presented by the appellees in the present case, that the "guest statute" had been upheld in most of our sister states where its constitutionality had been considered, stating:

"The Constitution of each of these states contains a provision similar to the provisions of section 14 of our Constitution, but there is no provision in either of the Constitutions similar to the provisions of sections 54 and 241 of our Constitution." *Id.* at 350.

The court then quotes from an Oregon case the phrase that became the principal bone of contention in *Carney v. Moody,* "[t]he purpose of this provision is to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution." *Ludwig* 49 S.W.2d at 350. But the concept of jural rights must be understood in the broader context in which it was used in *Ludwig,* where it was applied to a fact situation nonexistent at the time of the 1890 Constitution. This is clear from the concluding paragraph in the *Ludwig* opinion:

"The statute under consideration violates the spirit of our Constitution as well as its letter as found in sections 14, 54, and 241. It was the manifest pur-

pose of the framers of that instrument to *preserve and perpetuate the common-law right of a citizen injured by the negligent act of another* to sue to recover damages for his injury." [Emphasis added]. *Id.* at 351.

The jural right to sue for personal injury or death caused by negligence or other wrongful acts was well recognized in 1891 when our Constitution was adopted. The right had been fenced in, depending on circumstances, by artificial barriers such as privity, which *Saylor v. Hall* describes as "the erroneous interpretation of the 1842 English case of *Winterbottom v. Wright,* 152 Eng.Rep. 402, that generated the steadily eroded 'general rule' that there was no liability of a contracting party to one with whom he was not in 'privity.'" *Saylor v. Hall,* supra, 497 S.W.2d at 223. In the present case Mrs. Perkins was in privity of contract with Northeastern Log Homes if she was a co-purchaser, or indeed, even if not under the concept of privity codified in KRS 355.2–318, in 1958, which includes "any natural person who is in the family or household of [the] buyer ... if it is reasonable to expect that such person may use, consume or be affected by the goods."

■ The point is that the critical cases on this subject, which we have cited above, afford protection of "jural rights" in a broad context as our Kentucky Constitution intended, and not in the narrow context utilized in *Carney v. Moody.* As stated in *Tabler v. Wallace,* the concept of negligence expresses "a generalized standard of care," and one that "preexisted the Kentucky Constitution." 704 S.W.2d at 187. In drafting our constitutional protections in §§ 14, 54 and 241, our founding fathers were protecting the jural rights of the individual citizens of Kentucky against the power of the government to abridge such rights, speaking to their rights as they would be commonly understood by those citizens in any year, not just in 1891. The protection afforded to jural rights is not limited definitively to fact situations existing in the year 1891. *Carney v. Moody* opines that not "every enlargement

in the field of liability" is beyond the reach of the policy of the General Assembly, 646 S.W.2d at 41. We agree. But we do not agree that anything as fundamental as the cause of action for personal injury or wrongful death based on negligence, or, indeed, at this point in time, as the cause of action against a manufacturer based on liability in tort for a defective product, can be abolished at will by the General Assembly. Liability in tort for a defective product is not "liability without fault," as mistakenly stated in *Fireman's Fund Ins. v. Gov't. Employees Ins., Co.,* Ky., 635 S.W.2d 475, 477 (1982). It is simply liability for negligent conduct as that concept has evolved over the last forty years. *Nichols v. Union Underwear,* Ky., 602 S.W.2d 429 (1980), the landmark case on the subject, explains that "[t]he strict liability standard is no different from that of negligence, they say, except that the seller is presumed to have knowledge of the actual condition of the product when it leaves his hands." *Id.* at 433. Product liability law is nothing more than the continuing historic evolution of the ancient cause of action for trespass on the case as that principle now applies in products liability cases. The plaintiffs in this case have asserted a cause of action in tort for both negligence as such and for a defective product. Both theories are based on a finding of fault and there is no reason to deny the protection of §§ 14, 54 and 241 to one or the other.

The appellants stated at oral argument that every time since 1973 that our Court has held the "no action" statute unconstitutional, it has done so for one basic reason, the statute is fundamentally unfair. The appellees responded that "fairness is not the issue ... it may be unfair, but it is not unconstitutional." Fundamental fairness is part and parcel of the concept underlying the rights guaranteed to us by our constitution; and, conversely, the various sections in it protecting individual rights from legislative interference cannot be understood or applied without reference to fundamental fairness.

■ The statute of repose stratagem has spread. There is hardly a commercial segment in our society that does not now approach the General Assembly with the argument that it confers some significant benefit on "the state's economy" (to use the reason stated in the prefatory clause to the present act), which deserves some special privilege or immunity. Statutes of repose have been enacted in some states for products liability cases, and those in the health care industry have also enjoyed success elsewhere in this regard. The most recent case in point in Kentucky is *McCollum v. Sisters of Charity*, Ky., 799 S.W.2d 15 (1990), holding unconstitutional under Kentucky Constitution §§ 14, 54 and 241, a recently enacted statute cutting off any cause of action "against a physician, surgeon, dentist or hospital … for negligence or medical malpractice" not "commence[d] within five years from the date on which the alleged negligent act or omission is said to have occurred," regardless of whether the cause of action had yet accrued. The object of this statute was, of course, to avoid the "discovery rule" of *Tomlinson v. Siehl*, Ky., 459 S.W.2d 166 (1970) and *Hackworth v. Hart*, Ky., 474 S.W.2d 377 (1971). The evolution of judicial doctrine to include the discovery rule within the ambit of jural rights is as much of recent origin as the fall of the citadel of privity. The *McCollum* case refers to the fact that in some instances, narrowly circumscribed, there was a cause of action in tort against a physician preexisting the 1891 Constitution, but the fundamental concept involved in *McCollum* is the same as present circumstances, i.e., the Kentucky Constitution must be applied to fundamental jural rights as presently accepted in society, not frozen in time to the year 1891. The principle of constitutional interpretation applicable here is no different than *Brown v. Bd. of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), providing contemporaneous meaning to the Fourteenth Amendment of the U.S. Constitution to the problem of segregated schools:

"In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)] was written. We must consider public education in the light of its full development and its present place in American life…." 347 U.S. at 492–93, 74 S.Ct. at 691, 98 L.Ed. at 880.

In *McCollum v. Sisters of Charity*, we state:

"McCollum could not recover until a cause of action existed. Proof of damage is an essential part of his medical malpractice cause of action. Such proof was not available to him until 1985, when he first discovered his injury. Yet the legislature, through the five-year cap in KRS 413.140(2), would require McCollum to do the impossible—sue before he had any reason to know he should sue. This is antithetical to the purpose of the open courts provisions in the Kentucky Constitution. Movant need not board this bus to Topsy–Turvy Land."[2] *Id.* 799 S.W.2d at 19.

Thus, we conclude the 1986 version of KRS 413.135 is still constitutionally defective as special legislation and further attempts to amend it to overcome the constitutional defects fatally impale upon Kentucky Constitution §§ 14, 54 and 241. If the statute were amended, or a new statute written, to impose a statute of repose for every conceivable cause of action in tort, thus avoiding § 59, such would be a clear violation of §§ 14, 54 and 241.

■ Thus, to the extent that the decisions of this Court in *Carney v. Moody*, *supra* and in *Fireman's Fund Ins. v. Government Emp. Ins.*, Ky., 635 S.W.2d 475 (1982), are in conflict with our decision in this case, they are overruled. Further, the Briefs in this case have been supplemented by a recent decision in the Ken-

**2.** "Topsy–Turvy Land," a place described by Judge Jerome Frank in *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir.1952), where you "die before you are conceived, or be divorc-ed before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a non-existent railroad."

tucky Court of Appeals in *Brown v. Neel*, Ky.App., 798 S.W.2d 690 (1990), which is in conflict with the decision in this case, and which is also overruled.

*Tabler v. Wallace* covers the development and promotion of this legislation by those engaged in the construction industry and also the pertinent constitutional history behind the 1891 Kentucky Constitution. It suffices here to incorporate by reference these portions of the *Tabler* Opinion because the same judicial reasoning must follow for the present Opinion. Appendix A to Roberts' Brief cites constitutional provisions in other states where the construction industry's "no action" statute has fared better. Many of these states have an open courts provision similar to the Kentucky Constitution, § 14. But few have additional protection of claims for personal injury and wrongful death as we have in Kentucky Constitution §§ 54 and 241. Many have general protection against "arbitrary power" as we have in Kentucky Constitution § 2, and guarantees of "equal" rights and protection against "grant" of "separate ... privileges" as we have in Kentucky Constitution § 3. But few have additional protection against local and special legislation as we have in Kentucky Constitution § 59. So far as we can determine, none has anything like the combination of broad constitutional protection of individual rights against legislative interference vouchsafed by our 1891 Kentucky Constitution. *Tabler v. Wallace* was drawn against the background of the Kentucky Constitution of 1891 and the multitude of provisions, detailed in nature, limiting the authority of the General Assembly.

Recognizing that a majority of the states have upheld the construction industry's statute of repose against attack on constitutional grounds, our obligation is to comply with the letter and spirit of the Kentucky Constitution. If that places us in a statistical minority, we can only commiserate with the citizens of other states who do not enjoy similar protection.

## II. THE DISCOVERY RULE

The second question certified to us from the U.S. District Court is "whether KRS 413.135 applies to latent disease cases and, if so, whether the statute of limitations commences from the date the plaintiff knows or should have discovered the injury or disease."

■ Holding the statute unconstitutional obviates the need to decide whether it applies, which brings us to the larger question of whether the discovery rule applies where latent disease is caused by a deficiency in construction. *Louisville Trust Co. v. Johns–Manville Products*, Ky., 580 S.W.2d 497 (1979), controls the answer to this question. In the *Johns–Manville Products* case, the plaintiff's decedent was exposed to asbestos fiber dust which resulted from sawing and planing asbestos boards in the course of his employment. His estate filed a personal injury and wrongful death action alleging "malignant mesothelomina, a rare type of lung cancer, caused by breathing asbestos dust and fibers." 580 S.W.2d at 498. Our Court applied the "analysis adopted by the U.S. Supreme Court in *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)," stating "[t]he thrust of *Urie* is that when an injury does not manifest itself immediately the cause of action should accrue not when the injury was initially inflicted, but when the plaintiff knew or should have known that he had been injured by the conduct of the tortfeasor." 580 S.W.2d at 499–500. We applied our previous decisions in *Tomlinson v. Siehl*, Ky., 459 S.W.2d 166 (1970) and *Hackworth v. Hart*, Ky., 474 S.W.2d 377 (1971), which "apply the so-called 'discovery' rule to actions for medical malpractice," to a latent disease case against the manufacturer of a defective product. *Id.* We then addressed a further problem in latent disease cases, one which seems to be present in the case before us, regarding knowledge of the "causal connection" between the product and the disease, resolving this problem by embracing the following quote from a New Hampshire Supreme Court case, *Raymond v. Eli Lily & Co.*, 117 N.H. 164, 371 A.2d 170 (1977):

"In a case, such as the one before us, in which the injury and the discovery of the

causal relationship do not occur simultaneously, it is important to articulate exactly what the discovery rule means. We believe that the proper formulation of the rule and the one that will cause the least confusion is the one adopted by the majority of courts: *a cause of action will not accrue under the discovery rule until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct.*" [Emphasis original]. 580 S.W.2d at 501.

Thus in reply to Question Two certified to us by the U.S. District Court we respond that in the circumstances presented the statute of limitations commences from the date the plaintiff knew or should have discovered "not only that he has been injured but also that his injury may have been caused by the defendant's conduct."

The answers as stated in this Opinion are so certified.

STEPHENS, C.J., and COMBS, LAMBERT, LEIBSON, SPAIN and WINTERSHEIMER, JJ., concur.

REYNOLDS, J., concurs in results only.