QUEENSWAY FINANCIAL HOLD-
INGS LTD.; Paradigm Acquisitions
Corporation; and Paradigm Insur-
ance Company, Appellants

v.

COTTON & ALLEN, P.S.C., Appellee.

No. 2004–SC–000254–DG.

Supreme Court of Kentucky.

Nov. 1, 2007.

A. Courtney Guild, Jr., Edward L. Schoenbaechler, Hall, Render, Killian, Heath & Lyman, P.S.C., Louisville, KY, Counsel for Appellants.

Mark S. Fenzel, Dana Lucas Collins, Middleton Reutlinger, Louisville, KY, Counsel for Appellees.

Opinion of the Court by Justice NOBLE.

Queensway Financial Holdings, Ltd., and its subsidiaries filed a professional malpractice suit against Cotton & Allen, P.S.C., for alleged breach of contract and negligence related to audits of the financial statements of an insurance company to be bought by Queensway. A little over a year after the purchase, the Indiana Department of Insurance ordered a significant increase in the loss reserves of the

insurance company. The trial court and Court of Appeals held that the suit, filed approximately two years after the audits but less than a year after the ordered reserves increase, was filed outside the statute of limitations. This Court affirms.

## I. Background

In 1997, Queensway Financial Holdings, Ltd., a publicly traded Canadian corporation, negotiated and agreed to buy Paradigm Insurance Company, which was incorporated in Indiana, headquartered in Louisville, Kentucky, and licensed to sell insurance in several states. Under the agreement, Paradigm was to produce an audited financial statement as of September 30, 1997. The audited statement, described as a "basis statement" created pursuant to generally accepted accounting principles (or GAAP), was to be used to set the purchase price. The audit was to be performed by Cotton & Allen, P.S.C., a certified public accounting firm that had performed Paradigm's audits beginning in 1991 up to and including the one for the year ending on December 31, 1996.

As part of the audit, Cotton & Allen was to review Paradigm's reserves, the amount of money set aside to cover estimated claims, losses, and defense costs connected to outstanding policies over a particular period of time. The reserves involved in the audit were set by Paradigm's management but were certified by actuaries employed by Arthur Andersen, LLP, which was hired either by Paradigm or Queensway. Cotton & Allen relied on the certification of the reserves in its audit.

The audit process required Cotton & Allen's employees to spend considerable time at Paradigm's Louisville offices to review files and financial data. As part of Queensway's due diligence before the purchase, several of its representatives were also present. The representatives included Sandra Dowling, Vice President of Finance and Administration; Cathy Wilson, Executive Vice President; Shawn Doherty, an in-house actuary; and David Rooney, President and CEO. Dowling, Wilson, and Rooney are all Canadian Chartered Accountants, the Canadian analog of certified public accountants. The Queensway representatives reviewed Paradigm's claim files and had access to information about the company's reserves, including the actuarial reports certifying them.

On December 5, 1997, before Cotton & Allen delivered the report on its audit, Greg Bubalo, Paradigm's general counsel and head of claims, sent a memorandum titled "Changes in Reserving Philosophy" to Shawn Doherty, Queensway's in-house actuary. The memorandum discussed Paradigm's methodology for setting reserves and indicated a change in that methodology. Specifically, the memorandum stated:

> The Company's current reserving methodology was implemented in January of 1996 by Greg Bubalo, Vice President (Claims) and General Counsel. After evaluating the "by-line" loss development patterns, it was determined that the CMP [commercial multi-peril] loss reserving was in need of systematic revision. The intent of the selected loss reserving rehabilitation plan was to attain adequacy through the utilization of a "stair step" process.

> It is important to note that a significant source of CMP adverse development for the 1993 to 1995 loss years is attributable to the broad spectrum of risk classes inappropriately incorporated into the "CMP" line of business. Although the bulk of the premium could be attributed to the risks involving hotels, motels, restaurants, night clubs and bars, this LOB [line of business] also contained a potpourri of other risks that

made consistent and predictable reserving difficult. In these years, the CMP line contained auto, construction, and a mixture of other "occurrence" based risks which contributed significantly to "long tail" losses, now being seen as more fully developed in the 1996 and 1997 time frame.

As the first in the "stair step" process, a major upward adjustment was made in 1996 to the CMP reserves. This was a direct consequence of additional information acquired in 1995, as well as the change in management of the Claims and Underwriting Departments. In accordance with this process, additional upward adjustments have been made in 1997.

The document continued, describing generally how and when Paradigm sets reserves for litigated matters, including indemnity and expenses, and matters not yet in litigation. It then focused on the specific lines of business, including commercial multi-peril (or general business insurance), medical professional liability, and maritime/ocean marine.

Cotton & Allen delivered its audit report on December 16, 1997. Queensway then completed its purchase of Paradigm and took over operations of the company as of December 31, 1997.

When Queensway took over operations, Paradigm's reserves were adjusted upward by approximately $3.3 million as reflected in a memorandum from Greg Bubalo dated December 31, 1997. The memorandum was sent to the president and two other officers of Paradigm, which at that point was owned by Queensway. A copy of the memorandum was also sent to Shawn Doherty. The memorandum discussed recent unfavorable developments in Paradigm's commercial multi-peril line of business that required the increase in reserves. It then went on to discuss the developments in specific cases requiring the reserves adjustment.

Queensway subsequently asked Cotton & Allen to perform an audit of Paradigm's financial statement through December 31, 1997. This statement was the yearly statement required by Indiana's insurance code. Cotton & Allen began work on it on January 15, 1998, and the final report was submitted on January 29, 1998. The reserves involved in this audit were certified by actuaries employed by [Pricewaterhouse]Coopers, LLP, which again was hired either by Paradigm or Queensway. Cotton & Allen relied on the certification of the reserves in its audit.

On May 12, 1998, Shawn Doherty sent Greg Bubalo an email regarding the December 31, 1997 memorandum about the increase in reserves. In the email, he acknowledged receiving the memorandum, noted that it showed the amount by which the commercial multi-peril reserves had been changed, and asked, "What had happened in the first quarter with regard to those claims? Specifically, do you believe there is an [sic] deficiency remaining against those claims? (If so, please provide the amount so I can add it back into my estimates.)" Bubalo replied by email on June 2, 1998, discussing the specific developments in the cases mentioned in the December 31, 1997 memorandum. Several of the cases were settled and several were still outstanding with varying assessments of the chances of success. After discussing the specific cases, the email continued, in relevant part:

I think the cases as related above are not the problem. As I told you in my previous memo, a primary concern is the "0" indemnity assigned to claims we expected to win. An additional problem is the need for a standard reserve on those claims newly opened or not yet fully developed.

In the past month, the claims department has been working on a solution. At this time, *my best guess* would require an increase of $1,216,3434 in CMP (including artisan) to resolve this deficiency. An additional $200,000 in expense would also be required.

Please do not take this as "written in stone." Notice that I use the word "guess." Certain factors must still be taken into consideration.

**Firstly,** Paradigm's Artisan LOB will suffer the biggest impact when we begin entering "standard" reserves. However, in my opinion, our Infinity system and the actuary reporting from accounting has never adequately taken into consideration the multiple levels of deductibles on this line of business. As I discussed with you on the phone, we are in the process of transferring ceded reserves to the claims department. In the course of the transfer, our department is developing a more accurate measure of the impact of SIR'S and deductibles on all lines of business, especially Artisan.

**Secondly,** you and I discussed on the phone the problem with the past calculation of the ceded reserves. Our new system of calculation may have a big impact on the "net" results, although at this point I am not comfortable in telling you whether the impact will be positive or negative from Paradigm's perspective.

(Emphases as in original.)

In the fall of 1998, the Indiana Department of Insurance, through its actuaries, Merlino & Schofield, Inc., reviewed Paradigm's books as part of its triennial evaluation. In the course of this review, Merlino and Schofield questioned the adequacy of Paradigm's reserves. On October 5, 1998, Bubalo sent a memo to Merlino & Schofield titled "Carried Reserves Below Actuaries [sic] Indicated Reserves" in response to inquiries about why the reserves in the December 1997 financial statement were lower than those recommended in the [Pricewaterhouse]Coopers actuarial report. Bubalo's memorandum noted that the reserves in Paradigm's December statement were $25,256,000, making them only 94.8% of the "indicated reserves" of $26,527,917 in the actuarial report, but nevertheless placing them within the report's "acceptable range" of $24.9 million to $28.1 million. The memorandum then discussed why Paradigm had selected the " 'low' range" in setting its reserves, focusing on significant changes in the reserving practices in medical malpractice cases and discussing various data in support of the idea that Paradigm's reserves were adequate. The memo concluded, "Although some may debate the decisions, selection of the low ultimate[ly] was a reasonable discretionary business decision. Although Management's selection did not slavishly copy [Pricewaterhouse]Coopers, even [Pricewaterhouse]Coopers freely acknowledged that the decision was within the range of reasonable." Copies of the memo were sent to Queensway's Chief Financial Officer and an auditor for the Indiana Department of Insurance.

On February 15, 1999, the Department of Insurance issued a Verified Report of Examination of Paradigm and ordered the company's reserves to be adjusted upward by approximately $6 million. That same day, Queensway had another of its acquisitions, North Pointe Insurance Company, begin a review of Paradigm's reserves. Joseph MacLean, an employee of North Pointe, met with senior company management and selected claims adjusters, and reviewed a small number of claims from each line of business. His review resulted in a February 18, 1999 memorandum titled "Paradigm Claim Department Review" and a subsequent undated memorandum.

The February 18 memorandum discussed Paradigm's claims philosophy, the organization of its claims department, and an overview of its claims operations. The latter part included a section discussing Paradigm's reserves practice, noting,

> Great concern with case reserves because Greg Bubala [sic] admits that the case reserves do not reflect exposures. Bubala [sic] indicates that if reserves were immediately adjusted to exposures then the company would experience financial hardship when considered in concert with the actuarial IBNR [incurred but not reported] adjustments.
>
> . . . .
>
> Some indication that reserves are not increased to exposure until the actual payment is made.
>
> Adjusters can make reserve changes in the system that is above their authority levels.
>
> Generally, adjusters keep Greg . . . apprised of reserve issues.
>
> . . . .
>
> Litigation budgets are not adequately reflected in reserves. . . .

The memorandum concluded with a general evaluation of the claims department, noting that the claims handling was better than average for the type of carrier but there was room for improvements. However, regarding the reserves, it noted,

> Greg Bubala [sic] agrees that case reserves are low (he even has a spreadsheet documenting which cases are deficient), and the rationale is that financial difficulties require a strategy of incrementally stepping-up reserves. I still believe that reserves are philosophically

and strategically below actual case exposures. Greg Bubala [sic] believes that his valuation of cases is superior to others (outside service providers/mediators), yet the source information for his conclusions is provided by outside service providers (attorneys/adjusters). Current standard/plug reserves are inadequate even if you only consider the payment history since 1995 and 1996. Case reserves do not reflect ultimate exposure (see statistics above). Statement that average payments have improved since 1995 is not confirmed by statistics.

The later, undated memorandum incorporated the February 18 memorandum and referred to "[n]otes regarding examples of reserve manipulation on specific claims," which consisted of several pages of discussion of specific cases and the reserves set for them, including four of the cases discussed in Bubalo's June 2, 1998 email to Shawn Doherty.[1] The entry for one case, not from the email, described it as "probably one of the most blatant cases of reserve manipulation," and showed a reduction of the reserve to zero between 1994 and 1996 (despite a later jury verdict of $2 million). The memorandum noted of the case,

> The reason they focused on these loss years is because they were trying to show reserve development improvements to window-dress Paradigm. In addition, by adjusting the 93–95 loss years they could use these putative improvements to convince the actuaries that the loss experience was improving,

1. The undated memo also referred to another document that purportedly suggested significant increases in reserves following something called "Phase One Review." It is unclear whether the Phase One Review was the review performed on February 15, 1999, an extension of that review, or an entirely separate review. The memo also noted that a review of Paradigm's medical malpractice and taxicab insurance was conducted "in the summer of 1999," resulting in a reserve change of approximately $2.5 million.

which would give them more actuarial projections in 1996 and 1997.

On February 11, 2000, Queensway filed suit against Cotton & Allen, alleging breach of contract and negligence in auditing the financial statements and asking for damages both as of the time the purchase of Paradigm and afterward. Cotton & Allen moved for summary judgment on the ground that the claims were time-barred by KRS 413.245. Copies of the documents discussed above, along with affidavits of Allen Priest, a Director of Cotton & Allen who had been actively involved in the audits, and of Greg Bubalo, were attached to the motion for summary judgment. Queensway's response to the motion included no evidentiary attachments other than a copy of the "Change in Reserving Philosophy" memorandum.

The trial court granted summary judgment, holding that Queensway knew or should have known of any professional malpractice by Cotton & Allen as early as December 1997, when it began operating Paradigm and therefore had full access to the claims files, and no later than October 1998, when Greg Bubalo's memorandum attempting to explain the low level of reserves was submitted. The Court of Appeals affirmed and adopted the trial court's opinion as its own. Queensway sought and was granted discretionary review of that decision by this Court.

## II. Analysis

### A. The Statute of Limitations for Professional Malpractice

Queensway continues to argue in this appeal that the one-year statute of limitations for professional negligence, KRS 413.245, was tolled until at least February 15, 1999, meaning that its suit was timely filed. KRS 413.245 provides in relevant part:

Notwithstanding any other prescribed limitation of actions which might otherwise appear applicable, except those provided in KRS 413.140, a civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

The statute actually provides two different limitations periods: one year from the date of the "occurrence," and one year from the date of the actual or constructive discovery of the cause of action. *Michels v. Sklavos*, 869 S.W.2d 728, 730 (Ky.1994).

The "occurrence" limitation period begins to run upon the accrual of the cause of action. *Id.* The accrual rule is relatively simple: " '[A] cause of action is deemed to accrue in Kentucky where negligence and damages have both occurred. . . . [T]he use of the word "occurrence" in KRS 413.245 indicates a legislative policy that there should be some definable, readily ascertainable event which triggers the statute.' " *Id.* at 730 (quoting *Northwestern Nat. Ins. Co. v. Osborne*, 610 F.Supp. 126, 128 (E.D.Ky. 1985)) (alterations in original). Basically, "a 'wrong' requires both a negligent act and resulting injury. *Damnum absque injuria*, harm without injury, does not give rise to an action for damages against the person causing it." *Id.* at 731. The difficult question when applying the rule is usually not whether negligence has occurred but whether an " 'irrevocable non-speculative injury' " has arisen. *Id.* at 730 (quoting *Northwestern Nat. Ins. Co. v. Osborne*, 610 F.Supp. 126, 128 (E.D.Ky.1985)).

The second or "discovery" limitation period begins to run when the cause of action was discovered or, in the exercise of reasonable diligence, should have been discovered. *Id.* at 730. This rule is a codification of the common law discovery rule, *id.* at 732, and often functions as a "savings" clause or "second bite at the apple" for tolling purposes.

The trial court and the Court of Appeals dealt with this case primarily under the discovery rule. They addressed the accrual issue, but did so in terms of the discovery rule. Citing *Perkins v. Northeastern Log Homes,* 808 S.W.2d 809 (Ky. 1991), they held that a cause of action accrues when it is discovered or becomes discoverable. But under the professional malpractice statute of limitations, mere knowledge of some elements of a tort claim, such as negligence without harm, is insufficient to begin running the limitations period where the cause of action does not yet exist. *Michels,* 869 S.W.2d at 731–32. In this respect, the approach employed by the lower courts is improper under the professional malpractice statute, in that it collapses the accrual rule into the discovery rule when the two are analytically distinct. Admittedly, *Perkins* does say that a cause of action will not accrue until the plaintiff discovers or reasonably should have discovered that he is injured and that the injury was caused by the defendant, *id.* at 819, but in so doing it is describing how the common law discovery rule works under the general limitations statute to extend the tolling of the limitations period, which the general statute describes as running only upon accrual of the cause of action. The fact that the language employed in *Perkins* discusses a cause of action accruing under the discovery rule does not remove the distinction between it and the accrual rule where the malpractice limitation statute expressly includes both.

The distinction between the two rules is important because, when properly applied, the accrual rule means that the limitations period does not even begin to run until the cause of action accrues. Until that time, no cause of action yet exists, meaning a lawsuit would be premature and should be dismissed.

Where a plaintiff claims that its suit was filed within the limitations period under both the accrual and discovery rules, as in this case, analyzing a claim only under the discovery rule does not make sense because, by its very nature, the discovery limitations period cannot begin to run until the accrual period begins. Addressing the discovery rule first, and then addressing the accrual rule in terms of discovery, further turns the required analysis on its head. Instead, the plaintiff's statute of limitations claim must be evaluated separately under both the accrual and discovery rules. Moreover, it makes sense to begin with the accrual limitation period.

## B.  Accrual of the Cause of Action

Queensway's argument before this Court focuses on the accrual rule. Specifically, Queensway claims its cause of action did not accrue until the $6 million reserve adjustment was ordered by the Indiana Insurance Department, because only then did its damages become fixed and non-speculative. This, however, does not focus on the correct injury and damages, as shown by cases applying the malpractice limitations statute.

In *Michels v. Sklavos,* 869 S.W.2d 728, 730 (Ky.1994), the plaintiff alleged malpractice on the part of his attorney in pursuing a wrongful discharge suit. The Court held that the worker's claim against his attorney did not accrue until the underlying wrongful discharge suit was complet-

ed (it was dismissed for failure to pursue administrative remedies), not when he switched attorneys. *Id.* at 730–31.

In *Alagia, Day, Trautwein & Smith v. Broadbent,* 882 S.W.2d 121 (Ky.1994), the plaintiff sought tax planning advice from an attorney. The advice eventually resulted in the IRS assessing the plaintiff with a significant tax deficiency, penalties, and interest. The Court held that the plaintiff's cause of action for malpractice did not accrue until the amount owed to the IRS was finally negotiated by another attorney (it was reduced from $3.5 million to $1.2 million) because until that time the damages were speculative and not fixed. *Id.* at 125–26.

In *Meade County Bank v. Wheatley,* 910 S.W.2d 233 (Ky.1995), the plaintiff bank obtained a title opinion from an attorney, who failed to disclose a mortgage on the property in question. Though the plaintiff knew of the negligence, and even had an appraisal showing the value of the house to be less than the secured claims on it, the Court held that the plaintiff's damages were not fixed until the house was subsequently sold pursuant to foreclosure. The Court noted that prior to the sale, the bank only had a fear that it would suffer a loss, and that the "fear was not realized as damages until the sale of the property. . . ." *Id.* at 235.

Queensway relies on these cases to support its claim that its damages were speculative until Indiana ordered the reserves increase. It argues that financial loss might not have occurred without the ordered adjustment, since the reserves might have turned out to be adequate "due to unexpected success in settlements or jury verdicts that were actually under-reserved." This argument fails on multiple levels.

To begin with, unlike the cases cited by Queensway, there was no underlying con-tinuing negotiation or lawsuit in which Cotton & Allen was involved. Cotton & Allen is alleged to have been negligent in performing its audits, the last of which was complete in January 1998. In this way this case is more like *Faris v. Stone,* 103 S.W.3d 1 (Ky.2003), where the Court declined to allow a separate proceeding (a CR 60.02 collateral attack) to toll the statute of limitations for a legal malpractice claim related to litigation that had become final several years before.

While creative, Queensway's argument also misconstrues both the nature of the alleged damages and the effect of the reserve adjustment. Any damages that Queensway may have suffered stem from its overpayment for Paradigm. If the reserves were set too low, then the price paid for the company was too high. It is important to note that the reserve adjustment did not require Queensway or Paradigm to pay out any money; rather, it required only that cash from surplus be shifted to reserves on Paradigm's books. The reserve adjustment ordered by Indiana affected only the book value of the company; its real value, as a function of its premiums versus actual exposure, was already lower. In fact, if Queensway's analysis is correct, then its cause of action still has not accrued, since it still may suffer no loss related to under-reserved claims, should it be fortunate enough to have "unexpected success" on those claims. Once those claims are final, any money fortuitously over-reserved would become profit. Queensway's analysis would also mean that it would have had no cause of action had it determined for itself that the reserves were too low.

Any damages that Queensway suffered became fixed and non-speculative when it purchased Paradigm. The company was either overpriced at that time or it was not. The order from Indiana Department

of Insurance to adjust the reserves did not change this fact; it at most constituted inescapable proof of the prior misevaluation of Paradigm, which goes more towards the discovery rule than the accrual rule. As such, the trial court and Court of Appeals were correct, albeit for the wrong reasons, that Queensway's cause of action accrued well more than a year prior to its filing suit.

## C. Discovery of the Cause of Action

Queensway's success then depends on whether it enjoys the benefit of the discovery rule. On this point, Queensway claims that summary judgment was inappropriate because there is at least a material issue of fact as to when it knew or reasonably should have known of its cause of action against Cotton & Allen.

■ Summary judgment is used " 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.' " *Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255, 256 (Ky.1985) (quoting *Roberson v. Lampton,* 516 S.W.2d 838, 840 (Ky.1974)). Summary judgment is only proper when it would be impossible for the plaintiff to produce any evidence at trial warranting a judgment in his favor. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 480 (Ky.1991). In ruling on a motion for summary judgment, a court is required to construe the record in a light most favorable to the party opposing the motion. *Id.* While this means doubts are to be resolved in favor of Queensway, that it did not file evidence of its own in response to Cotton & Allen's motion for summary judgment cannot be ignored, since ordinarily "[t]he party opposing a properly presented summary judgment motion cannot defeat it without presenting at least some affirma-

tive evidence showing the existence of a genuine issue of material fact for trial." *City of Florence v. Chipman,* 38 S.W.3d 387, 390 (Ky.2001); *see also Wymer v. JH Properties, Inc.,* 50 S.W.3d 195, 199 (Ky. 2001) ("The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment."). The litigants need only be "given an opportunity to present evidence which reveals the existence of disputed material fact...." *Hoke v. Cullinan,* 914 S.W.2d 335, 337 (Ky.1995). Thus, unless questions of material fact are self-apparent from the record, summary judgment was appropriate.

■ Based on the record in this case, it is clear that Queensway should have known of its cause of action beginning in December 1997 when it completed its purchase.

Before the purchase of Paradigm was completed, Greg Bubalo notified Queensway's actuary that he was changing the way reserves were to be calculated, specifically noting that the company's method for setting reserves in its commercial multiperil line of business "was in need of systematic revision" and that the "intent of the loss reserving rehabilitation plan was to attain adequacy through the utilization of a 'stair-step' process." Bubalo went on to describe how reserves had been adjusted upward in 1996 and 1997 as part of this "stair-step process" and that this had been necessitated in part because a "broad spectrum of risk classes [had been] inappropriately incorporated into the 'CMP' line of business." At the very least, this should have put Queensway on notice that Paradigm's loss reserve techniques had been deficient in the past.

■ This is not to say that Bubalo's reserve-methodology-changes memoran-

dum alone began the running of the discovery limitation period. Because the purchase had not yet been completed at that point, there was not yet a cause of action to discover. As noted above, the discovery rule can only come into play once a cause of action arises, which can only happen when the injury becomes fixed. Rather the memorandum is noted simply because it shows that Queensway had some information that there were reserve problems at the time of purchase.

However, the controlling factor is that on the day Queensway took over operations of Paradigm—some time after it had completed its purchase—Greg Bubalo notified it that the reserves were being increased by $3.3 million because of adverse developments in the three months since Cotton & Allen's September 30,1997 audit. This reserve adjustment had the same type of effect on Paradigm's book value, differing only in degree, as the later adjustment ordered by the Indiana Department of Insurance. At that time, Queensway had knowledge of a reduction in the value of Paradigm and should have known that something was amiss with the way reserves were being calculated. When combined with the fact that the reserves had previously been adjusted upward as part of a plan to "attain adequacy" of reserves, the significant, postpurchase adjustment should have been especially troubling.

The response to this is that the obvious problems with Paradigm's reserve setting system did not by themselves mean Queensway should have known of Cotton & Allen's alleged negligence. However, that Queensway had to make a significant adjustment, and in essence suffered losses after having had the benefit of Cotton & Allen's audit report, should have put them on notice that something was wrong with the report. Cotton & Allen's report showed no problem with the reserves, yet within weeks of its delivery, Paradigm had to make significant adjustments to those reserves. The disconnect between these two facts is striking and would lead a reasonable owner to investigate why the report had failed to show the inadequacy of reserves that had to be adjusted upward only a short time later. Assuming Cotton & Allen was responsible for assessing the reserves (rather than relying on actuarial certifications), such an investigation would have revealed one of two things as of December 31, 1997: either Paradigm's claims had taken significant unpredictable turns in the fourth quarter, or Cotton & Allen had been negligent in auditing the reserves.

Regardless of which option (or combination of the two) was true, it was clear that Queensway knew it had suffered damages at that time by the amount of the decrease in Paradigm's true value as a result of the reserves adjustment. The fact that the cause of the injury may not have been obvious does not mean Queensway could avoid the effects of the discovery rule statute of limitations at that point. "[T]he discovery rule does not operate to toll the statute of limitations to allow an injured plaintiff to discover the identity of the wrongdoer unless there is fraudulent concealment or a misrepresentation by the defendant of his role in causing the plaintiff's injuries." *McLain v. Dana Corp.*, 16 S.W.3d 320, 326 (Ky.App.1999). "A person who knows he has been injured has a duty to investigate and discover the identity of the tortfeasor within the statutory time constraints." *Combs v. Albert Kahn Associates, Inc.*, 183 S.W.3d 190, 199 (Ky.App. 2006). Had Queensway exercised reasonable diligence, it would have taken some steps, upon notice of the $3.3 million reserves adjustment, to discover the source of the injury.

Queensway argues that the documents from Greg Bubalo could not have put them on notice of negligence because each document attempted to explain how the reserves situation was improving. That might have been the case had Cotton & Allen's reports demonstrated any problem with the reserves, but they did not. The fact that Bubalo's documents consistently demonstrated some problem with the reserves, regardless of whether they were improving, contradicted the alleged assertions in Cotton & Allen's audit reports that the reserves were sound. The total circumstances should have put Queensway on notice.

The dissonance between Bubalo's claims and Cotton & Allen's reports was underscored in further documents. The May 12, 1998 email from Shawn Doherty to Greg Bubalo demonstrates that he, as a Queensway employee, was aware of and had questions about Bubalo's claims regarding the reserves. And Bubalo's June 2, 1998 email to Doherty, which referred to additional reserves problems yet to be addressed, demonstrated that reserves had been and continued to be an issue. Bubalo's October 5, 1998 memorandum admitted that Paradigm had intentionally chosen to set reserves in the low range recommended by the actuaries. More importantly, the purpose of the memorandum was to respond to questions raised by the Indiana Department of Insurance about the adequacies of the reserves.

Queensway attempts to show the existence of various questions of fact by arguing about the meaning of these documents and whether and when Queensway received copies of them. For example, Queensway claims that how or when it got a copy of the December 31, 1997 memorandum from Bubalo and what it may have done with that information remain questions of fact for the jury to decide. There are several problems with this argument. There is no evidence in the record to dispute that Queensway had a copy of this memorandum any later than May 12, 1998, when one of its employees, Shawn Doherty, sent an email discussing the document. And the relevant question, for purposes of the statute of limitations, is not how Queensway or another party used the information, but what it should have known given receipt and knowledge of the content of the document. This type of argument, without evidentiary support, does not create a material issue of fact that will bar summary judgment.

In light of the foregoing discussion, it is clear that there is no question of fact about the content of the various documents, whether and when Queensway received copies of them, or that they contained statements that contradicted Cotton & Allen's audit reports. The trial court and Court of Appeals did not err in holding that Queensway "had numerous opportunities to discover any issues regarding the mishandling of the insurance reserves" and should have known of its injury as early as December 1997 and no later than October 1998. Because Queensway's suit was filed in February 2000, more than a year after either of those dates, it was filed outside any applicable statute of limitations period contained in KRS 413.245. Summary judgment on this ground was proper.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

LAMBERT, C.J.; CUNNINGHAM, MINTON, SCHRODER and SCOTT, JJ., concur. ABRAMSON, J., not sitting.