RENDERED: AUGUST 24, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0070-DG

SHAN WOLFE                                                                 APPELLANT


                          ON REVIEW FROM COURT OF APPEALS
V.                                  NO. 2020-CA-1480
                    MCCRACKEN CIRCUIT COURT NO. 18-CI-00106


JOE KIMMEL;                                                                  APPELLEE
THE KIMMEL LAW FIRM


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

In the underlying action, Shan Wolfe (Wolfe) filed a professional

malpractice claim against Joe Kimmel and The Kimmel Law Firm (collectively,

Kimmel) for negligently providing her poor legal advice regarding her exit from a

business that she co-owned.  The sole issue we must address is on what date

Wolfe's damages became irrevocable and non-speculative sufficient to trigger

the one-year statute of limitations for a professional malpractice claim under

KRS[1] 413.245.

After careful review of our decisional law, we conclude that *Alagia, Day,*

*Trautwein & Smith v. Broadbent*,[2] was wrongly decided and has led to

---

[1] Kentucky Revised Statute.

[2] 882 S.W.2d 121 (Ky. 1994).

inconsistencies in our jurisprudence regarding when damages are considered irrevocable and non-speculative for a professional malpractice claim. Accordingly, we hereby overrule *Broadbent* and its progeny insofar as they hold that, for a non-litigation legal malpractice claim, a claimant's damages are not irrevocable and non-speculative until the claimant knows the exact dollar amount of damages he or she incurred because of the malpractice. To establish more uniformity in how KRS 413.245 is applied, we now hold that for a non-litigation legal malpractice claim, a claimant's damages are considered irrevocable and non-speculative when the claimant is reasonably certain that damages will indeed flow from the defendant's negligent act.

We therefore affirm the Court of Appeals, though on slightly different grounds, and hold that Wolfe's legal malpractice claim against Kimmel was not timely filed.

## I. FACTS AND PROCEDURAL BACKGROUND

The facts of this case are not disputed. In June 2014, Wolfe began a company, GenCare, Inc. (GenCare), with Robin Lampley (Lampley). GenCare provided in-home care for elderly and disabled individuals. Lampley served as GenCare's president and Wolfe as its vice president, and each owned 50% of the business. Two years later, Wolfe wanted to leave GenCare due to her belief that Lampley was mishandling the business' finances. In April 2016, Wolfe sought Kimmel's legal advice regarding how to leave GenCare and start her own in-home healthcare company. Kimmel advised Wolfe that she could begin the process of starting a competing business before she resigned from GenCare.

2

Based on Kimmel's advice, Wolfe started her own in-home healthcare business, Legacy In Home Care, Inc. (Legacy), without first resigning from GenCare. Due to licensing requirements, there was a delay of several weeks before Legacy could begin operating. During that period, Kimmel further advised Wolfe that she could take GenCare employees and clients with her to Legacy. Kimmel sent letters to two of GenCare's clients, the Veteran's Administration and ClearCare Software, which stated that Wolfe "[had] all rights legally to add any and all clients/patients of GenCare, Inc., who wish to contract services with her." Wolfe contacted employees of GenCare to inform them she was starting Legacy, and several agreed to leave GenCare and work for Legacy. Kimmel also advised Wolfe that she could take patient charts and records from GenCare.

By late July 2016, Wolfe had obtained all the necessary licensing requirements for Legacy to operate. On July 29, Wolfe sent a formal letter of resignation to Lampley and promptly thereafter began operating Legacy using former GenCare employees. On August 1, 2016, Lampley's attorney sent Wolfe a cease-and-desist letter which stated that "[a]s a director and/or officer of GenCare, Inc., [Wolfe owed] the company a common law fiduciary duty and a statutory duty under K.R.S. § 271B.8-300 and K.R.S. § 271B.8-420." The letter stated that if Wolfe did not cease Legacy's operations, return all clients to GenCare, and give all of Legacy's profits to GenCare, GenCare would sue Wolfe and Legacy for tortious interference with contract and prospective contract. Lampley's attorney also sent letters to the employees that left GenCare for

3

Legacy, informing them that their contracts with GenCare contained non-compete clauses.

On August 19, 2016, Lampley and GenCare sued Wolfe, Legacy, and several Legacy employees who formerly worked for GenCare. Shortly thereafter, Kimmel determined that he would be unable to represent Wolfe and Legacy in the suit and referred Wolfe to attorney Todd Farmer (Farmer) who specialized in that area of the law. Wolfe met with Farmer in August 2016, and during that meeting Farmer "immediately and repeatedly reprimanded" Wolfe for her actions. He informed her that she could not legally start a competing company while still working for GenCare, and that she had no right to take GenCare employees, patients, or patient records. Farmer further advised Wolfe that she needed to reach a settlement agreement with GenCare and Lampley as soon as possible because she would undoubtedly lose if the case proceeded to trial. Almost a year later, on July 17, 2017, the parties' settlement agreement was finalized. Wolfe agreed to pay Lampley $30,000 and relinquish her GenCare shares to Lampley, which were valued at $150,000.

Based on the foregoing, Wolfe filed the underlying professional malpractice claim against Kimmel on February 14, 2018. Her complaint alleged that Kimmel had been negligent in advising her regarding her exit from GenCare and sought compensatory damages for both her economic losses and for "humiliation, embarrassment, personal indignity, apprehension about her future, emotional distress, and mental anguish[.]" After nearly two years of

4

discovery, Kimmel filed a motion for summary judgment on January 28, 2020. Kimmel's motion alleged that Wolfe failed to file her claim within the one-year statute of limitations period of KRS 413.245.[3] The trial judge granted Kimmel's motion. The order simply stated: "The Court believes plaintiff failed to file her complaint in a timely manner and it must therefore be dismissed, with prejudice. In reaching this conclusion, the Court relies on the arguments expressed in support of the defendant's motion and the citations contained therein."

Kimmel's motion for summary judgment argued that the statute of limitations began to run no later than August 2016. Citing *Conway v. Huff*,[4] Kimmel noted that Wolfe was informed by another attorney that she had been improperly represented by Kimmel in August 2016. Also during that month, legal harm caused by that negligent representation had occurred: Wolfe's complaint stated that GenCare's cease and desist letter from August 1 caused her emotional distress and mental anguish; GenCare and Lampley filed a lawsuit against her on August 19 based on her actions in following Kimmel's advice, for which Wolfe had to expend money to defend and suffered emotional distress; and Wolfe paid a $5,000 retainer to hire an attorney to represent the GenCare employees also named in the suit. And, more damages were certain to occur: Farmer encouraged her to reach a settlement agreement with Lampley

---

[3] We note that Kimmel asserted a statute of limitations defense in his answer to Wolfe's February 14, 2018, complaint.

[4] 644 S.W.2d 333 (Ky. 1982).

5

as soon as possible because she "would lose in a trial and end up owing Ms. Lampley a significant amount of money."

Kimmel disputed Wolfe's argument that her legal harm did not become irrevocable and nonspeculative until she settled with Lampley in July 2017. In doing so, he relied on *Board of Education v. Zurich Insurance Co.,* a U.S. District Court case, which held that "'fixed and non-speculative' does not mean that damages, to trigger the initiation of the limitations period, must be translatable into a specified dollar amount. Kentucky law has never required as much[.]"[5] That holding was later relied upon by this Court in *Matherly Land Surveying, Inc. v. Gardiner Park Development, LLC.*[6]

Wolfe appealed, and a split Court of Appeals panel affirmed.[7] Relying primarily on *Saalwaechter v. Carroll,*[8] the Court of Appeals rejected Wolfe's claim that her damages had not become irrevocable and non-speculative sufficient to trigger KRS 413.245 until she settled with Lampley in July 2017.[9] Instead, it held "that it was clear by August 2016" that she would incur damages because of Kimmel's negligence, and her claim was therefore

---

[5] 180 F. Supp. 2d 890, 893 (E.D. Ky. 2002), *aff'd sub nom. Estill Cnty. Bd. of Educ. v. Zurich Ins. Co.,* 84 Fed. Appx. 516 (6th Cir. 2003).

[6] 230 S.W.3d 586, 591 (Ky. 2007).

[7] *Wolfe v. Kimmel,* 2020-CA-1480-MR, 2021 WL 5751648 (Ky. App. Dec. 3, 2021).

[8] 525 S.W.3d 100 (Ky. App. 2017).

[9] *Wolfe,* 2021 WL 5751648, at *2.

untimely.[10]  Wolfe thereafter appealed to this Court, and we granted discretionary review.

## II.    ANALYSIS

### A. Standard of Review

In reviewing an appeal from an order granting summary judgment, this Court determines whether the trial court was correct in finding that there were no genuine issues of material fact and that the moving party was entitled to summary judgment as a matter of law.[11]  As summary judgment requires only an examination of the record to determine whether material facts exist, we generally review a grant of summary judgment *de novo*, giving no deference to the trial court's assessment of the record or its legal conclusions.[12]

### B. KRS 413.245

It is not disputed that KRS 413.245 is the applicable statute of limitations for Wolfe's professional malpractice claim against Kimmel.  KRS 413.245, enacted on July 15, 1980, directs in relevant part:

> [A] civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

---

[10] *Id.* at *3.

[11] Kentucky Rule of Civil Procedure (CR) 56.03.

[12] *See, e.g., Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010).

7

As this Court has previously explained, KRS 413.245 actually contains two separate statutes of limitations.[13] The first is a statute limiting to "one year from the date of the occurrence," and the second statute provides a limit from one year "from the date when the cause of action was, or reasonably should have been, discovered by the party injured," if that date is later in time than the occurrence date.[14] Because "occurrence" and "cause of action" are used synonymously within the statute, the occurrence date is the date that a cause of action has accrued.[15]

> A cause of action is deemed to accrue in Kentucky where negligence and damages have both occurred, subject in certain kinds of actions to the additional requirement of discovery of the claim by the plaintiff. . . . [T]he use of the word "occurrence" in KRS 413.245 indicates a legislative policy that there should be some definable, readily ascertainable event which triggers the statute. . . . [T]his is the date of "irrevocable non-speculative injury."[16]

In other words, "a 'wrong' requires both a negligent act and resulting injury. *Damnum absque injuria*, harm without injury, does not give rise to an action for damages against the person causing it,"[17] and "mere knowledge of some elements of a tort claim, such as negligence without harm, is insufficient to

---

[13] *Michels v. Sklavos*, 869 S.W.2d 728, 730 (Ky. 1994).

[14] *Id.*

[15] *Id.*

[16] *Id.* (quoting *Nw. Nat. Ins. Co. v. Osborne*, 610 F. Supp. 126, 128 (E.D. Ky. 1985)).

[17] *Michels*, 869 S.W.2d at 731.

begin running the limitations period where the cause of action does not yet exist."[18]

The second statute of limitations within KRS 413.245, the discovery date, is the codification of a common law principle recognized in cases such as *Tomlinson v. Siehl,*[19] and *Louisville Trust Co. v. Johns–Manville Products.*[20, 21] The discovery rule "presumes that a cause of action has accrued, i.e., both negligence and damages has occurred, but that it has accrued in circumstances where the cause of action is not reasonably discoverable[.]"[22] The discovery rule acts to toll the statute of limitations "until the claimant knows, or reasonably should know, that injury has occurred."[23] Accordingly, the discovery date is only implicated if a complaint for professional malpractice was not filed within one year of the occurrence date,[24] and it "often functions as a 'savings' clause or 'second bite at the apple' for tolling purposes."[25]

---

[18] *Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 148 (Ky. 2007).

[19] 459 S.W.2d 166 (Ky. 1970) (holding that the statute of limitations for a medical malpractice claim against a physician who negligently performed a sterilization surgery on a female patient did not begin to run until she discovered she was pregnant).

[20] 580 S.W.2d 497 (Ky. 1979) (holding that the *Tomlinson* discovery rule extended to tort actions for injuries resulting from latent disease caused by exposure to harmful substances).

[21] *Michels*, 869 S.W.2d at 732.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 730 ("If the suit was filed within one year of the 'date of occurrence,' we need not concern ourselves with the meaning and application of the discovery rule.").

[25] *Queensway*, 237 S.W.3d at 147.

## C. KRS 413.245 Case Law

Notwithstanding the ostensible simplicity of the foregoing principles, the history of our case law in this area is "extant, yet murky"[26] to say the least, and demonstrates that difficulties often arise in determining whether and when an "irrevocable and non-speculative injury" has occurred. It is therefore useful to begin with a discussion of several precedents.

The first case to address KRS 413.245 following its enactment was *Conway v. Huff*. Ruby Huff was represented by attorney James Conway during her dissolution of marriage action but was thereafter dissatisfied with her award under the dissolution judgment.[27] On January 18, 1980, Huff consulted another attorney, Richard Porter, who informed her that she had been poorly or inadequately represented by Conway.[28] Six weeks later, Porter told Huff she could file a claim against Conway for legal malpractice.[29] Huff did not file her legal malpractice claim until January 22, 1981, and the circuit court dismissed it on Conway's motion for summary judgment on the grounds that it was barred by KRS 413.245.[30]

The sole issue that the *Conway* Court addressed was "if knowledge that one has been wronged starts the running of the statute of limitations or if knowledge that the wrong is actionable starts the running of the statute of

---

[26] *Zurich*, 180 F. Supp. 2d at 891.

[27] *Conway*, 644 S.W.2d at 334.

[28] *Id.*

[29] *Id.*

[30] *Id.*

limitations."[31]  It likened the situation to the discovery theory used to determine when the statute of limitations begins to run on a medical malpractice claim, and reasoned that "the statute [starts] to run when the surgery patient discovers the sponge," not when "an attorney tells the patient that legal action lies against the surgeon[.]"[32]  The *Conway* Court held that "the statute of limitations on Huff's claim against Conway started to run on January 18, 1980, the day that she discovered that she may have been poorly or inadequately represented," and was therefore time barred.[33]

One year after *Conway* was rendered by this Court, the Court of Appeals issued *Graham v. Harlin, Parker & Rudloff*.[34]  As discussed below, *Graham* was subsequently overruled by *Broadbent*.  But, as we are overruling *Broadbent*, and because the *Broadbent* Court did not discuss *Graham*, a synopsis is useful for context.  Frances Graham was represented by William Rudloff in her dissolution of marriage action.[35]  A provision of her dissolution judgment stated that Graham would receive $500 per month "toward the support of the family."[36]  Due to this wording, on August 7, 1980, the IRS declared the payments to be alimony taxable to Graham and assessed a deficiency against her personal income tax returns for the years 1975 through 1981 exceeding

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] 664 S.W.2d 945 (Ky. App. 1983), *overruled by Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121 (Ky. 1994).

[35] *Graham*, 664 S.W.2d at 946.

[36] *Id.*

11

$17,000.[37]  On October 6, 1980, Graham petitioned the U.S. Tax Court for a redetermination of the deficiency.[38]

Meanwhile, a state circuit court held a hearing and determined that all parties to the dissolution action intended the $500 payments to be child support, and on June 25, 1981, the court entered a second dissolution judgment amending the original decree *nunc pro tunc*.[39]  During the same hearing, Graham testified that she received her notice from the IRS in November 1980, and she knew at that time that the IRS's decision was based on the wording of her dissolution judgment.[40]  Graham was unsuccessful in her petition before the U.S. Tax Court and on August 30, 1982, it entered a judgment against her holding that the circuit court's *nunc pro tunc* order was not retroactive for tax purposes and assessed a $5,487 deficiency against her for the years 1975 through 1977.[41]

On September 23, 1981, Graham filed a legal malpractice claim against Rudloff, but summons was not issued and served until March 12, 1982.[42]  The suit was dismissed on Rudloff's motion for summary judgment on the grounds

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

that it was untimely filed, and Graham appealed.[43]  The Court of Appeals

affirmed; it reasoned that

> the date on which she discovered that a wrong had occurred and
> that it was caused by [Rudloff] was in November 1980, after she
> became aware that the tax deficiency had been assessed against
> her, and that as the initial tax court hearing for a redetermination
> went on, she also became aware that the reason was because of
> the way the decree was worded.  It was then she realized the
> responsibility was [Rudloff's].[44]

The court rejected Graham's assertion that "she first knew she had a right to

sue on September 1, 1982, when there was a final determination by the U.S.

Tax Court[.]"[45]  Citing *Conway*, the court reasoned that "the running of the

statute on appellant's claim began on the day that she discovered that she may

have been poorly or inadequately represented."[46]  And, as that date was

sometime in November 1980, the March 1982 issuance and service of

summons was untimely.[47]

The next two cases, *Hibbard v. Taylor*[48] and *Michels v. Sklavos*, although

rendered two years apart, can be considered companion cases.

In *Hibbard*, Coleman Taylor was represented by James Hibbard during

litigation wherein Taylor sought to rescind a contract based on his allegation

---

[43] *Id.* at 946-47.

[44] *Id.* at 947.

[45] *Id.*

[46] *Id.* (internal quotation marks omitted).

[47] *Id.*

[48] 837 S.W.2d 500 (Ky. 1992).

that the other party to the contract had misrepresented material facts.[49]

Following a trial, directed verdict was entered against Taylor for failing to present any evidence that the alleged misrepresentations were material.[50] Taylor appealed the trial court's ruling to the Court of Appeals, which affirmed; the decision became final on August 25, 1989.[51] Hibbard represented Taylor throughout the entirety of the appeal.[52]

On August 24, 1990, Taylor filed a claim for professional malpractice against Hibbard which was subsequently dismissed on summary judgment as time barred.[53] The trial court reasoned that if malpractice in fact occurred, "then the directed verdict itself was the notice to [Taylor] herein that he had been wronged which started the statute of limitations running."[54] The Court of Appeals reversed and reasoned that "because damage is necessarily speculative during the pendency of appeal, a cause of action for legal malpractice does not accrue until the appellate process is final."[55]

Relying on *Conway*, the *Hibbard* Court affirmed, and reasoned that Taylor could not have "discovered the sponge" when the directed verdict judgment was entered against him because at that point no third party

---

[49] *Id.* at 500

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.* at 500-01.

[55] *Id.* at 501.

attorney had told him he had been poorly represented (as Huff was told in *Conway*) and, moreover, he could not have stated with certainty that the directed verdict against him was caused by his attorney's error and not the trial court's error.[56] Stated differently, if Taylor had filed a malpractice suit at that time, he could not have claimed that his attorney's error was the proximate cause of his legal injury nor could he claim that he had suffered damages, because the appellate court could have ultimately ruled in his favor:

> It is evident to us that Taylor discovered his cause of action when he reasonably should have—when the result of the appeal became final and the trial court's judgment became the unalterable law of the case. Only then was Taylor put on notice that the principal damage (the adverse judgment) was real; but more importantly, only then could he justifiably claim that the entire damage was proximately caused by counsel's failure, for which he might seek a remedy, and not by the trial court's error, for which he would have none.[57]

The *Hibbard* Court accordingly affirmed the Court of Appeals and held that Taylor's claim was timely filed.[58]

In *Michels*, John Sklavos hired Fredrick Michels and Nicholas Carlin to represent him in a wrongful termination suit against his former employer.[59] The claim was initially filed in state circuit court but was later removed to the

---

[56] *Id.* at 502 ("Generally, in prosecuting an appeal, an attorney tells the client that the sponge was left by the trial court, not by trial counsel, and that any harm (e.g., cost of appeal, bond, adverse judgment) is *damnum absque injuria* [damage without injury].").

[57] *Id.*

[58] *Id.*

[59] *Michels*, 869 S.W.2d at 728.

15

U.S. District Court for the Western District of Kentucky.[60]  While the case was pending in federal court, Sklavos fired Michels and Carlin and retained Benjamin Lookofsky to continue the litigation.[61]  Thereafter, on September 14, 1989, the U.S. District Court granted the employer's motion for summary judgment based on Sklavos' failure to first pursue administrative remedies.[62]

On March 23, 1990, Sklavos filed a professional malpractice claim against Michels and Carlin.[63]  The claim was dismissed on summary judgment for untimeliness based on the trial court's finding that Sklavos should have known of any alleged wrong when he retained Lookofsky approximately one and half years before filing the malpractice suit because Lookofsky "knew or should have known of any alleged negligence immediately upon taking over the case[.]"[64]

This Court disagreed; it reasoned that what Sklavos "knew or should have known," i.e., the discovery date, was irrelevant because Sklavos had filed his claim within one year of the occurrence date.[65]  Relying on *Hibbard*, the *Michels* Court reasoned that

> [w]here, as in the present case, the cause of action is for "litigation" negligence, meaning the attorney's negligence in the preparation and presentation of a litigated claim resulting in the failure of an otherwise valid claim, whether the attorney's negligence has

---

[60] *Id.*

[61] *Id.* at 728-29.

[62] *Id.* at 729.

[63] *Id.*

[64] *Id.*

[65] *Id.* at 730.

16

caused injury necessarily must await the final outcome of the underlying case.[66]

So, even assuming arguendo that Michels and Carlin were in fact negligent and that Lookofsky informed Sklavos that they were negligent, until the U.S. District Court issued an adverse ruling against Sklavos, he would have had no cause of action against them "because damages, if any, were as yet inchoate and speculative."[67] Specifically, "[d]amages were contingent upon whether [Sklavos' employer] would interpose the lack of an administrative claim as an affirmative defense to the wrongful discharge case, and upon whether the United States District Court would rule in favor of [the employer] if such a defense was presented."[68] The Court accordingly held that Sklavos' claim was timely under KRS 413.245.[69]

In sum, *Hibbard* held that when the cause of action alleged in a legal malpractice claim is for litigation malpractice a claimant does not have a cause of action against the attorney until the underlying case becomes final. This is sound reasoning: because "occurrence date" means "cause of action" under KRS 413.245, if a claimant cannot allege that they have suffered a legal harm, that their attorney's malpractice was the proximate cause of that harm, and that they have incurred damages, they have no cause of action, and the occurrence date statute of limitations has not yet been triggered. And *Michels*

---

[66] *Id.*

[67] *Id.* at 731.

[68] *Id.*

[69] *Id.* at 733.

simply held that the *Hibbard* rule applies even if a claimant fires the allegedly negligent attorney prior to the underlying case becoming final.

But how does one determine when irrevocable and non-speculative damages have occurred when a legal malpractice claim is not for litigation negligence? That is the issue that this Court addressed in *Broadbent* just five months after it issued *Michels*.

In *Broadbent*, Smith and Mildred Broadbent hired Bernard Barnett for estate planning services.[70] Based on Barnett's advice, the Broadbents decided to convey substantial acreages of farmland to their sons believing that the manner in which it was conveyed would result in their sons not having to pay gift taxes.[71] The conveyance documents were prepared by Barnett, executed by the Broadbents, and the next three to four years passed uneventfully.[72] But, after an audit, the IRS determined that the conveyed farmland had been substantially undervalued.[73] As a result, the IRS claimed that the Broadbents owed $3.5 million in gift taxes, penalties, and interest as of the year 1985.[74] Barnett, or some member of his firm, Alagia, Day, Trautwein, & Smith, represented the Broadbents in the IRS matter from June 1985 until June 30, 1989, when it was undisputed that the representation ended.[75]

---

[70] *Broadbent*, 882 S.W.2d at 122.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* at 123.

Between June 1985 and June 1989, there were extensive negotiations between the IRS and Barnett's firm and the firm assured the Broadbents that the issue would be satisfactorily resolved.[76] A letter dated January 25, 1989, from the firm to the Broadbents regarding its negotiations with the IRS "brought forcefully to the Broadbents' attention that a substantial sum of money would be required by the IRS, but the exact amount remained uncertain."[77] On June 30, 1989, an attorney with the firm informed the Broadbents that they would be required to pay a sum in excess of $3 million dollars in five days' time.[78] The Broadbents ended the representation that day and hired a different firm which ultimately settled the claim with the IRS for $1.2 million dollars.[79]

The Broadbents filed a professional malpractice claim against Barnett and the firm on June 18, 1990.[80] This date was "less than one year after the attorney-client relationship was terminated and less than one year after the final amount due [to the IRS] was determined," but was "more than one year after the date of the original deficiency notice . . . and more than one year after the [firm's] letter of January 25, 1989, by which the Broadbents were definitely informed that some payment of money would be required."[81]

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

19

The trial court ruled that the claim was untimely.[82] Applying *Graham*, it concluded that the clock began to run on the Broadbents' claim when they received the 1985 IRS deficiency notice.[83] The trial court further held that the continuous representation rule as discussed in *Gill v. Warren*[84] was inapplicable to the facts before it.[85] A divided Court of Appeals panel applied the continuous representation rule, reversed the trial court, and held that the Broadbents' claim was timely.[86] The *Broadbent* Court affirmed the Court of Appeals, but did so on different grounds. Although the Court approved of the continuous representation rule in dicta,[87] it declined to apply it and instead relied entirely on *Hibbard* and *Michels*.[88]

The Court discussed that the *Hibbard* Court "concluded with the view that only at the end of the appellate process was the client put on notice that negligence may have occurred and only then could he assert that the damage was caused by his counsel's error," and that *Michels* "was resolved on the

---

[82] *Id.*

[83] *Id.*

[84] 751 S.W.2d 33 (Ky. App. 1988) (quoting *Wall v. Lewis*, 393 N.W.2d 758, 762 (N.D. 1986) ("As applied in legal malpractice actions, the [continuous representation] rule tolls the statute of limitations or defers accrual of the cause of action while the attorney continues to represent the client and the representation relates to the same transaction or subject matter as the allegedly negligent acts.")).

[85] *Broadbent*, 882 S.W.2d at 123.

[86] *Id.* at 124.

[87] *Id.* at 125 ("These are sound theoretical and practical reasons for adoption of the continuous representation rule. If this was the decisive issue, appellees would prevail as their claim was brought within one year of the date appellants' representation came to an end.").

[88] *Id.* at 124.

20

occurrence rule by which the commencement of the statutory period was postponed until finality of the underlying litigation, when the injury had become irrevocable and non-speculative."[89]  Based on these precedents, the Court held:

> [T]his case must be decided on the occurrence rule as discussed in *Michels* and urged by appellees, the Broadbents.  Until the legal harm became fixed and non-speculative, the statute did not begin to run.  As such, the statute was tolled until the subsequent law firm and the IRS settled the claim.  This suit was brought on June 18, 1990, well within one year of this event.[90]

The Court then stated "[w]e hereby overrule *Graham v. Harlin, Parker & Rudloff*, Ky. App., 664 S.W.2d 945 (1983), to the extent it differs herewith" without any further discussion.[91]

The *Broadbent* Court went on to discuss and dismiss three other dates that had been presented as possible dates on which the statute of limitations had been triggered.[92]  The first was the 1985 IRS notice: the Court held that date was inapplicable because "the negligence and damages were speculative and there could have been no discovery because of the continuous representation by appellants and the presumed reliance of the clients upon the advice given."[93]  The second was the firm's January 25, 1989, letter to the Broadbents which the Court held was inapplicable for the same reasons stated

---

[89] *Id.* at 125.

[90] *Id.* at 125-26.

[91] *Id.* at 126.

[92] *Id.*

[93] *Id.*

regarding the 1985 IRS notice.[94]  Finally, the Court held that the date the Broadbents fired the firm, June 30, 1989, was inapplicable.[95]  It reasoned that although "the events of this date were sufficient to trigger commencement of the statute if there had been an occurrence, the discovery of the negligence was ineffective as the final result was not yet known."[96]  Specifically, until the damages were fixed by the final compromise with the IRS there was no cause of action sufficient to trigger the occurrence date statute of limitations.[97]  This explanation seems to be inconsistent, as the Court had previously stated that the Broadbents would have prevailed if application of the continuous representation rule had been the decisive issue.

So, *Broadbent* essentially shoehorned the reasoning of *Hibbard* and *Michels*, which involved claims for litigation negligence, into a case that did not involve litigation negligence.  The consequence of this, whether intended or not, was that it created a rule that a cause of action cannot accrue, and therefore the occurrence limitation does not begin to run, in a non-litigation negligence claim until the claimant can state with certainty the exact dollar amount of damages they incurred.

For example, in *Meade County Bank v. Wheatley*, issued one year after *Broadbent*, Meade County Bank hired attorney Stephen Wheatley to prepare a

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

22

title opinion for a piece of real estate for which the bank intended to provide a mortgage loan to a client.[98]  Wheatley's title opinion failed to disclose a prior recorded mortgage which was not discovered by the bank until the client defaulted on the loan.[99]  Afterwards, in May 1991, an appraisal of the property revealed to the bank that the property's value was less than the secured claims on it.[100]  In June 1992, the bank bought the property pursuant to a foreclosure sale requiring it to satisfy the prior mortgage in the amount of $80,000.[101]  The bank filed a malpractice claim against Wheatley in October 1992.[102]  This Court held that the case was "legally indistinguishable" from *Broadbent*, and that the bank's claim was timely filed:

> In the present case, the time allowed began to run as of the date of the foreclosure sale.  Prior to that date, [the bank] had only a fear that [it] would suffer a loss on the property.  [Its] fear was not realized as damages until the sale of the property in June of 1992. At that time, what was merely probable became fact, and thus commenced the running of the statute.  The May 1991, appraisal which showed the property's value as being substantially less than the debts against it, was irrelevant as to certainty of damages.  At that point, appellant was merely made aware that it might have insufficient collateral on its loan.  There was no certainty of damages, as is required by *Broadbent*.[103]

Notably, Special Justice Levin dissented in *Wheatley* and argued that the appraisal indicating that the value of the property was substantially less than

---

[98] 910 S.W.2d 233, 234 (Ky. 1995).

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 235.

its outstanding debt combined with the bank's knowledge that its debt was secondary to a prior debt "certainly gave the bank sufficient knowledge of its non-speculative damage and revealed more than the 'mere probability of damages.'"[104]

The glaring problem with *Broadbent*'s analysis of how to determine when damages are irrevocable and non-speculative sufficient for an accrual of a cause of action for non-litigation legal malpractice is that it is plainly inconsistent with Kentucky law and caused KRS 413.245 to be interpreted in a different manner depending on whether the claim was for non-litigation legal malpractice or some other form of professional malpractice. These problems were put on display several years later in *Zurich*.

In *Zurich*, the Estill County Board of Education hired J.E. Black, PLLC and James Black to provide geo-technical engineering services for the construction of a middle school that was completed in August 1998.[105] By April 5, 1999, the Board discovered damage to the school caused by "the rising of the earth beneath the building."[106] The Board filed a claim with its insurance company, Zurich, and Zurich filed a professional malpractice against Black as the Board's subrogee on May 21, 2001.[107] In the opinion, the U.S. District Court for the Eastern District of Kentucky addressed Black's motion to

---

[104] *Id.*

[105] 180 F. Supp. 2d at 891.

[106] *Id.*

[107] *Id.*

dismiss Zurich's claim as untimely under KRS 413.245 and applicable

Kentucky decisional law.[108]

Black argued that the clock began ticking on the Board's malpractice

claim on the date that the damage to the school's floor was discovered, while

the Board argued, citing *Broadbent*, *Michels*, and *Wheatley*,[109] that the clock

did not begin until its damages were "fixed and non-speculative."[110] The court

addressed the issue as follows:

> The issue, then, is whether the damage to the middle school
> noticed by plaintiff on or about April 5, 1999 may be said to be
> "fixed and non-speculative." Though the meaning of this language
> is anything but clear, this much is certain: the court of appeals
> could not have intended these words to be interpreted as plaintiff
> has suggested. This is so because, **if plaintiff's interpretation is
> accepted, the limitations period for professional negligence
> actions would be effectively tolled until damages could be
> specified as an ascertainable sum certain**. This, of course, is not
> the law.
>
> With respect, plaintiff overstates the degree to which—under
> Kentucky law—damages must be defined in professional negligence
> claims. **Whatever it means, "fixed and non-speculative" does
> not mean that damages, to trigger the initiation of the
> limitations period, must be translatable into a specified dollar
> amount**. Kentucky law has never required as much[.]
>
> [. . .]
>
> Judging from its brief, plaintiff has interpreted "fixed and non-
> speculative" to be a quantitative requirement—in other words,

---

[108] *Id.* at 893.

[109] The Board cited an unpublished Court of Appeals case, *In re Ky. Cent. Life Ins. Co.*, 2001 WL 726781 (Ky. App., June 29, 2001), but the *Zurich* Court noted that the case "provides a succinct summary and synthesis of Kentucky's professional negligence case law[,]" including *Broadbent, Michels*, and *Wheatley. See Zurich*, 180 F. Supp. 2d at 893 fn. 3.

[110] *Id.* at 893.

plaintiff cites this language in support of the proposition that a professional negligence cause of action does not accrue until a would-be plaintiff understands or should reasonably understand the full extent of his damages. Read in context, however, **the phrase is more properly interpreted as tolling the limitations period for professional negligence claims until plaintiff is certain that damages will indeed flow from defendant's negligent act**.[111]

The court held that "the Board did know of damage on April 5, 1999. It was not a 'mere probability' that the Board would suffer damage; rather, the damage had already been done."[112] The court accordingly granted Black's motion for summary judgment.[113]

Nevertheless, following *Zurich*, this Court once again applied the *Broadbent* analysis in *Pedigo v. Breen*.[114] In that case, Cynthia Pedigo consulted with Michael Breen concerning a possible defective product claim against a breast implant manufacturer, but Breen declined to represent her.[115] Pedigo alleged that she brought her medical records with her to the consultation, and that Breen subsequently lost the records which precluded her from participating in a multi-district litigation (MDL) class action against

---

[111] *Id.* (emphasis added).

[112] *Id.*

[113] *Id.* The ruling in *Zurich* was affirmed by the Sixth Circuit Court of Appeals. *Estill Cnty. Bd. of Educ. v. Zurich Ins. Co.*, 84 Fed. Appx. 516, 519 (6th Cir. 2003) ("We think that the Kentucky statute requires that in order for the limitations period to commence, the plaintiff must be aware that he has in fact been damaged by the defendant's negligence. The statute does not require that the plaintiff be aware of the precise dollar amount or even the exact extent of the damage.").

[114] 169 S.W.3d 831 (Ky. 2004).

[115] *Id.* at 831-32.

the manufacturers.[116]  Pedigo "participated in several medical examinations

accumulating thousands of dollars in fees" to replace her original medical

records, but was informed that she still would not receive a settlement offer in

the class action because she did not have her original records.[117]  She

ultimately settled her claim with the manufacturer of her implants for an

amount that was five times less than what she would have received had she

participated in the MDL class action suit.[118]  The *Pedigo* Court held that the

claim for legal malpractice did not accrue until Pedigo settled her claim with

the manufacturer:

> Although the alleged loss of the records may have prevented
> Appellant from qualifying for the MDL class action, damages at
> that time were merely speculative and measurable only by the cost
> of attempting to reconstruct her medical records so that the breast
> implant case could proceed.  While the reconstruction of the
>
> medical records was necessary for [Pedigo] to proceed and costs
> were incurred, there was no accounting for the value of the
> underlying case because it was ongoing.  In other words, the cost
> of the records did not include the compensation Appellant claims
> to have lost because she failed to qualify for the MDL class action
> by timely production of her original medical records.  Not until
> Appellant reached a non-MDL settlement with [the manufacturer]
> on June 30, 1998, was she able to ascertain the damage
> sustained. As in [*Broadbent*] and other precedent, [Pedigo's]
> damages did not become fixed until the date of her settlement in
> the underlying case for which she had sought representation.[119]

---

[116] *Id.* at 832.

[117] *Id.*

[118] *Id.*

[119] *Id.* at 834.

Following *Pedigo*, in *Matherly, supra,* this Court applied the *Zurich* analysis to a professional, non-legal malpractice claim. In that case, Matherly Land Surveying, Inc., an engineering/land surveying firm, contracted with Gardiner Park Development, LLC to provide services related to the construction of a subdivision.[120] After Matherly had performed work on the project for a year, Gardiner became dissatisfied and ultimately fired Matherly and had to hire an engineering firm and a land surveying firm to complete the work.[121] After a failed attempt at mediation in December 1999, Gardiner filed suit against Matherly, which the trial court dismissed as untimely.[122]

On appeal, this Court rejected the argument that the suit was timely because Gardiner's damages were not yet irrevocable and non-speculative.[123] Citing *Zurich,* the *Matherly* Court stated that "[s]uch a standard would toll the statute of limitations until it was known with absolute certainty the amount of damages flowing from an incident,"[124] and that "Kentucky law has never required a specified dollar amount be known before the statute of limitations can run."[125] It then concluded:

> Potential damages were apparent when [Matherly] walked off the job and certainly apparent when the Gardiner Entities attempted mediation with [Matherly] in December 1999. At this time the Gardiner Entities produced a document which stated all of

---

[120] *Matherly*, 230 S.W.3d at 587.

[121] *Id.* at 588.

[122] *Id.*

[123] *Id.* at 590.

[124] *Id.* at 591.

[125] *Id.*

28

"Gardiner Design's Known Damages" and drafted a letter which stated that "Only within the last month have all of the problems and deficiencies with MLS's design been uncovered and fixed." It is obvious from the record that the Gardiner Entities were well aware that [Matherly's] actions caused them damages and had a good idea what those damages were in 1999.[126]

The final case in this saga is *Saalwaechter, supra.* In July 2007, Bill Saalwaechter hired attorney Thomas Carroll to represent him in a transaction to buy a pawn shop and surrounding real estate.[127] Saalwaechter believed under the terms of the documents surrounding the deal that he would own both the pawn shop and the surrounding land.[128] After some time Saalwaechter discovered that Carroll himself had purchased the shop; set up a new company, Evansville Pawn LLC; and had obtained a pawn license.[129] However, Carroll had procured the license on behalf of another individual who was paying Carroll a monthly fee for the business.[130] Such "straw licensing" schemes are illegal in Indiana, where the pawn shop was located, and the Indiana Department of Financial Institutions (DFI) refused to renew Carroll's pawn license and ordered him to wind up the business.[131]

At that point, Saalwaechter created his own entity, Fares Pawn LLC, and he and Carroll agreed that Fares Pawn would take possession of Evansville

---

[126] *Id.*

[127] 525 S.W.3d at 102.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

Pawn's inventory and liquidate its outstanding pawns.[132] DFI initially denied Saalwaechter's application for a pawn license, which he appealed.[133] After some negotiations with DFI regarding who would manage the store, DFI approved his application in early 2010.[134]

In April 2010, Saalwaechter filed a claim for professional malpractice against Carroll, which was dismissed in April 2014 for failure to prosecute.[135] In February 2015, Saalwaechter moved to set aside the dismissal, which was denied.[136] In May 2015, Saalwaechter filed a second action against Carroll asserting the same claims and factual predicate as the April 2010 action, the only difference was Saalwaechter's reference to his equal protection federal litigation against DFI based on its initial failure to grant his application for a license, which was initiated in October 2011.[137] The trial court granted Carroll's motion for summary judgment to dismiss the claim as untimely.[138] In doing so, it rejected Saalwaechter's argument that his damages did not become fixed and non-speculative until July 14, 2014, when the federal circuit court denied his appeal in his equal protection suit against DFI.[139]

---

[132] *Id.* at 102-03.

[133] *Id.* at 103.

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.* at 103-04.

[138] *Id.* at 104.

[139] *Id.*

Before the Court of Appeals, Saalwaechter argued that the trial court failed to properly apply *Broadbent* and *Wheatley*, and again asserted that, although he suffered losses in 2007 and 2008, his damages did not become fixed and nonspeculative until the federal court denied his appeal in his suit against DFI.[140]  The Court of Appeals disagreed, noting the language from *Zurich* that was later adopted by *Matherly*, that "fixed and non-speculative does not mean that damages, to trigger the initiation of the limitations period, must be translatable into a specified dollar amount."[141]  Moreover, the court pointed out that "unlike some of the cases cited by Saalwaechter, there is no litigation negligence, underlying continuing negotiation, or lawsuit in which Carroll was involved[,]" and that "Saalwaechter's subsequent lawsuit against DFI in 2011 for denying him a pawn license was collateral to, and wholly independent of, his action against Carroll."[142]  It concluded that

> [b]y the very language of Saalwaechter's first complaint in 2010, he was aware that he had been injured by Carroll's alleged negligent
>
> conduct.  At that point, even if he may not have known of the full extent of his damages in terms of the precise dollar amount, the fact of his injury was certainly "irrevocable" and "non-speculative."[143]

The court therefore held that Saalwaechter's 2015 complaint was untimely.[144]

---

[140] *Id.* at 105.

[141] *Id.* at 106.

[142] *Id.* at 106-07.

[143] *Id.* at 107.

[144] *Id.*

**D. *Broadbent* and its progeny are hereby overruled. Wolfe's professional malpractice claim against Kimmel was not timely filed.**

Based on the foregoing, the state of our KRS 413.245 jurisprudence as it currently stands is clearly inconsistent. Under *Broadbent*, *Wheatley*, and *Pedigo*, if a professional malpractice claim is for non-litigation negligence, the point at which the occurrence date begins to run is the date on which the claimant knows with certainty the exact monetary amount of damages they have incurred. Whereas under *Matherly*, and by extension *Zurich*, if a claim for professional malpractice is not for legal malpractice, damages are considered irrevocable and non-speculative when the claimant is certain that damages will indeed flow from the defendant's negligent act even if the exact dollar amount is unknown. And *Saalwaechter*, though a bit of an oddity due to its facts, is nevertheless significant because it applied *Matherly* and *Zurich* to a non-litigation legal malpractice claim to determine when damages became irrevocable and non-speculative.

Not surprisingly, this inconsistency has led to the parties in the case now before us to argue different positions that are both currently supported by the cases they cite. Wolfe argues under *Broadbent* and *Pedigo* that because Kimmel committed non-litigation malpractice that caused her to be sued by Lampley, her damages could not be irrevocable and non-speculative until Lampley's suit against her became final on July 17, 2017, when she and Lampley entered into a settlement agreement.[145]

---

[145] Wolfe also argues that *Saalwaechter* does not apply because in that case, Carroll's alleged malpractice had nothing to do with Saalwaechter's subsequent suit

In contrast, Kimmel contends that even the *Pedigo* Court stated that "[a] professional negligence claim does not accrue until there has been a negligent act and until **reasonably ascertainable** damages are incurred."[146] He further asserts under *Matherly* and *Zurich* that the occurrence date statute of limitations began to run no later than August 2016 because at that point Wolfe knew she had been injured by Kimmel's malpractice, had already incurred damages, and was certain that more damages would indeed result. Specifically, Wolfe's own complaint against Kimmel stated that she sustained emotional injuries on August 1, 2016, when she received the cease-and-desist letter from GenCare's attorney, and that she was sued by Lampley and GenCare on August 19, 2016, for which she incurred economic injury by paying attorney's fees for both her own attorney and a different attorney to represent GenCare's former employees. In addition, Kimmel's advice was so blatantly incorrect that Farmer advised Wolfe during an August 2016 meeting to settle the case as soon as possible because she would surely lose if the case went to trial and would end up owing Lampley and GenCare a substantial amount of money.

While it is true that *Matherly* and *Zurich* did not involve a legal malpractice claim, and therefore could theoretically be distinguished, this

---

against DFI for denying his pawn license. We agree that the facts of *Saalwaechter* make it inapplicable here.

[146] 169 S.W.3d at 833 (emphasis added) (citing *Faris v. Stone*, 103 S.W.3d 1 (Ky. 2003) (holding that a CR 60.02 motion will not toll the statute of limitations in KRS 413.245)).

Court concludes that the problems with the *Broadbent* line of cases are too blatant to ignore. As previously mentioned, Kentucky law has never required that damages be ascertainable in a specific dollar amount to state a cause of action for professional negligence. Accordingly, to require that a claimant know an exact dollar amount of damages before a cause of action for non-litigation legal malpractice can accrue—i.e., for the occurrence date to be triggered under KRS 413.245—is plainly wrong.

Additionally, KRS 413.245 by its plain language does not in any way distinguish between legal malpractice claims and other professional malpractice claims. It says that civil actions arising out of "**any** act or omission in rendering, or failing to render, **professional services**" shall be brought within one year of the occurrence date or one year from the date of discovery.[147] Yet because of *Broadbent* and its progeny, a judicial overwrite was created where non-litigation legal professional malpractice claims are treated very differently than non-legal professional malpractice claims. For claims that do not arise out of legal malpractice, damages are considered irrevocable and non-speculative when the claimant is certain that damages will indeed flow from the defendant's negligence. Whereas, for non-litigation legal malpractice claims, damages are considered irrevocable and non-speculative when the claimant can state with certainty the exact dollar amount of damages

---

[147] KRS 413.245 (emphasis added).

they incurred due to the defendant's negligence. In practice, this disparate treatment provides non-litigation legal malpractice claimants much more time before the occurrence date of KRS 413.245 begins to run on their claims.

Based on the foregoing, we hereby overrule *Broadbent* and its progeny, including *Wheatley* and *Pedigo*, insofar as they hold that damages are irrevocable and non-speculative when a claimant knows the exact dollar amount in damages they incurred due to a defendant's negligence. Instead, and to establish more uniformity in our professional malpractice cases, we reiterate that for a non-litigation, legal malpractice claim, the occurrence date limitation begins to run when negligence and damages have both occurred.[148] But we now hold that for such a claim damages are considered irrevocable and non-speculative when the claimant is reasonably certain that damages will indeed flow from the defendant's negligence.

In this case, the one-year statute of limitations began running on Wolfe's claim against Kimmel no later than August 2016 when she was advised by another attorney of Kimmel's malpractice. By that time, negligence and damages had both occurred sufficient to trigger the occurrence date limitation. It was undisputed that Kimmel and Wolfe had an attorney client relationship; Kimmel neglected his duty to exercise ordinary care when he provided her

---

[148] *See Michels*, 869 S.W.2d at 730 ("A cause of action is deemed to accrue in Kentucky where negligence and damages have both occurred[.]").

incorrect advice surrounding her exit from GenCare; and his negligence was the proximate cause of Wolfe's legal injuries. Wolfe's damages were also irrevocable and non-speculative in August 2016: according to her complaint against Kimmel, she suffered emotional distress for which she sought compensation when she received the August 1 cease-and-desist letter; and she was sued by Lampley and GenCare on August 19, which she incurred expenses and emotional distress in defending. Even assuming arguendo that the foregoing damages were insufficient for a cause of action to accrue, Farmer informed her in no uncertain terms in August 2016 that she needed to settle the case as soon as possible because she would lose at trial and owe Lampley and GenCare a substantial amount of money. She was therefore reasonably certain at that time that damages would indeed flow from Kimmel's negligence. The discovery date limitation is not applicable in this case because there are no circumstances suggesting that the cause of action was not reasonably discoverable.

Therefore, because the occurrence date limitation began to run in August 2016, and Wolfe did not file her malpractice claim until February 2018, her malpractice claim against Kimmel is time barred.

### III. CONCLUSION

Based on the foregoing, we affirm the Court of Appeals on slightly different grounds. Wolfe's professional malpractice claim against Kimmel was not timely filed under KRS 413.245.

36

VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Thompson, JJ, sitting. All concur.  Nickell, J., not sitting.

COUNSEL FOR APPELLANT:

John Saoirse Friend
Friend Law, PSC

COUNSEL FOR APPELLEES, JOE KIMMEL:

William Alexander Hoback
Mark Squires Fenzel
McBrayer PLLC